# UNITED STATES DISTRICT COURT
## DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER GILBERT, ALISON PAUK, MARILYN STRANGELAND, LESLIE WEIDNER, and DAVID WEIDNER on behalf of themselves and all others similarly situated, | Civil Action No. _____ |
| Plaintiffs, | |
| vs. | **CLASS ACTION COMPLAINT and <u>DEMAND FOR JURY TRIAL</u>** |
| TYSON FOODS, INC., TYSON CHICKEN, INC., TYSON BREEDERS, INC., TYSON POULTRY, INC., PILGRIM'S PRIDE CORP., SANDERSON FARMS, INC., SANDERSON FARMS, INC. (FOODS DIVISION), SANDERSON FARMS,INC. (PRODUCTION DIVISION), SANDERSON FARMS, INC. (PROCESSING DIVISION), PERDUE FARMS, INC., KOCH FOODS, INC., JCG FOODS OF ALABAMA, LLC, JCG FOODS OF GEORGIA, LLC, KOCH MEATS CO., INC., WAYNE FARMS, LLC, MOUNTAIRE FARMS, INC., MOUNTAIRE FARMS, LLC, MOUNTAIRE FARMS OF DELAWARE, INC., HOUSE OF RAEFORD FARMS, INC., PECO FOODS, INC., FOSTER FARMS, LLC, GEORGE'S, INC., GEORGE'S FARMS, INC., FIELDALE FARMS CORP., O.K. FOODS, INC., O.K. FARMS, INC., O.K. INDUSTRIES, INC., and SIMMONS FOODS, INC., | |
| Defendants. | |

Plaintiffs Christopher Gilbert, Alison Pauk, Marilyn Strangeland, Leslie Weidner, and David Weidner bring this action, individually and on behalf of all those similarly situated, against Defendants Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc., Tyson Poultry, Inc., Pilgrim's Pride Corporation, Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division), Sanderson Farms, Inc. (Processing Division), Perdue Farms, Inc., Koch Foods, Inc., JCG Foods of Alabama, LLC, JCG Foods of Georgia, LLC, Koch Meats Co., Inc., Wayne Farms, LLC, Mountaire Farms, Inc., Mountaire Farms, LLC, Mountaire Farms of Delaware, Inc., House of Raeford Farms, Inc., Peco Foods, Inc., Foster Farms, LLC, George's, Inc., George's Farms, Inc., Fieldale Farms Corporation, O.K. Foods, Inc., O.K. Farms, Inc., O.K. Industries, Inc., and Simmons Foods, Inc. (collectively, "Defendants"), and alleges as follows:

## INTRODUCTION

1.     This action arises out of a conspiracy to suppress and eliminate competition in the sale of broiler chickens ("Broilers") in violation of Section 1 of the Sherman Act of 1890, 15 U.S.C. § 1 (the "Sherman Act") and state laws. The conspiracy involved agreements to fix, stabilize, and maintain prices in the Broiler industry between January 1, 2008 and the present (the "Class Period").

2

2.    Broilers, as used herein, are chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, raw or cooked, or whole or in parts, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards and chicken sold for resale to be used as an ingredient in a value added product or serving.

3.    Plaintiffs are indirect purchasers of Broilers—consumers who purchased Broilers through intermediaries for their own consumption, usually at a grocery store or other retail market.

4.    The Broiler market is dominated by a small handful of vertically integrated Broiler companies—Defendants here—who own or control nearly every step of the Broiler product cycle, from breeding to processing.

5.    In response to decreasing profit margins, during the Class Period Defendants colluded with each other to reduce the supply of Broilers brought to market in the United States, engaging in a course of coordinated production cuts that, while against each Defendant's individual self-interest, nonetheless collectively raised Broiler prices, allowing each Defendant to capture supracompetitive profits.

6.    Defendants' collusive agreement was executed through both public announcements of cuts and private communications among top executives, and

3

facilitated by an unprecedented industry-wide information sharing program that transmits to each Defendant highly detailed data on each competitor's production, capacity, and financial metrics. This program, known as Agri Stats, allowed Defendants to track each other's business decisions and police their collusive agreement.

7.     Ordinarily, Broiler companies cut production with short-term measures that allow for a quick ramp-up of production in case of price increases. After signaling their industry for coordinated cuts and obtaining industry-wide compliance with the collusive scheme, however, Defendants took the unprecedented step of making coordinated reductions to their breeder flocks—the source of Broiler eggs. This step deliberately crippled Defendants' ability to increase production on a quick timeline, ensuring constrained supply for months in advance. These measures were designed to, and did, signal Defendants' commitment to a collusive scheme of supply restrictions.

8.     Having succeeded in raising Broiler prices with a series of coordinated production cuts in 2008 and 2009, Defendants earned large profits in 2009 and 2010. As prices began to slip, however, Defendants repeated their successful strategy, again coordinating a series of industry-wide production cuts that contravened Defendants' individual self-interest. Prices increased to record highs, and Defendants again reaped artificially high profits at consumers' expense.

9.     As a result of Defendants' collusive agreement, the price of wholesale Broilers has increased by roughly 50% over pre-Class Period levels. Plaintiffs believe retail prices experienced a correspondingly significant increase. At the same time, feed costs, the main component of Broiler production costs, have *decreased* by roughly 20%. Demand for Broilers has remained stable. These circumstances have led to record profits for Defendants.

10.     The code word Defendants' executives use for supply restraints is "discipline." The word appears throughout this Complaint, usually in the statements of Broiler CEOs as their express goal for the industry. The word is revealing, because it implies the setting aside of immediate self-interest in favor of long-term goals. This "discipline" has allowed Defendants to forego their individual competitive self-interests and instead act in coordination to extract artificially high prices from Plaintiffs and Class Members.

## PARTIES

### PLAINTIFFS

11.     Christopher Gilbert is a resident of Connecticut. During the Class Period, Gilbert indirectly purchased Broilers produced by Defendants in the State of New York.

12. Alison Pauk is a resident of New Mexico. During the Class Period, Pauk indirectly purchased Broilers produced by Defendants in the State of New Mexico.

13. Marilyn Strangeland is a resident of Illinois. During the Class Period, Strangeland indirectly purchased Broilers produced by Defendants in the State of Illinois.

14. Leslie and David Weidner are residents of Kansas. During the Class Period, they each indirectly purchased Broilers produced by Defendants in the States of Kansas and Missouri.

## DEFENDANTS

### *Tyson Foods*

15. Tyson Foods, Inc. is a publicly-traded Delaware corporation with its headquarters in Springdale, Arkansas. During the Class Period, Tyson Foods, Inc., either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

16. Tyson Chicken, Inc. is a Delaware corporation with its headquarters in Springdale, Arkansas. It is a wholly-owned subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Chicken, Inc., either directly or through its wholly-owned

or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

17. Tyson Breeders, Inc. is a Delaware corporation with its headquarters in Springdale, Arkansas. It is a wholly-owned subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Breeders, Inc., either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

18. Tyson Poultry, Inc. is a Delaware corporation with its headquarters in Springdale, Arkansas. It is a wholly-owned subsidiary of Tyson Foods, Inc. During the Class Period, Tyson Poultry, Inc., either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

19. In this Complaint, Defendants Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc., and Tyson Poultry, Inc. are referred to collectively as "Tyson Foods" or "Tyson."

### Pilgrim's Pride

20. Pilgrim's Pride Corporation is a Delaware corporation with its headquarters in Greeley, Colorado. During the Class Period, Pilgrim's Pride Corporation, either directly or through its wholly-owned or controlled subsidiaries

7

and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

21. In this Complaint, Pilgrim's Pride Corporation is referred to as "Pilgrim's Pride" or "Pilgrim's."

22. Pilgrim's filed a voluntary petition for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Northern District of Texas on or around December 1, 2008. Pilgrim's was discharged from bankruptcy effective December 28, 2009. Pilgrim's participated in the conspiracy alleged in this Complaint before, during, and after its bankruptcy, and affirmed its commitment by overt acts throughout the Class Period. Plaintiffs seek recovery of liability only for Pilgrim's post-discharge conduct; however, because this conduct includes participation in a conspiracy that began *before* Pilgrim's bankruptcy, Pilgrim's is jointly and severally liable for the damages incurred throughout the Class Period.

### Sanderson Farms

23. Sanderson Farms, Inc. is a publicly-traded Mississippi corporation with its headquarters in Laurel, Mississippi. During the Class Period, Sanderson Farms, Inc., either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

24.     Sanderson Farms, Inc. (Foods Division) is a Mississippi corporation with its headquarters in Laurel, Mississippi. It is a wholly-owned subsidiary of Sanderson Farms, Inc. During the Class Period, Sanderson Farms, Inc. (Foods Division), either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

25.     Sanderson Farms, Inc. (Production Division) is a Mississippi corporation with its headquarters in Laurel, Mississippi. It is a wholly-owned subsidiary of Sanderson Farms, Inc. During the Class Period, Sanderson Farms, Inc. (Production Division), either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

26.     Sanderson Farms, Inc. (Processing Division) is a Mississippi corporation with its headquarters in Laurel, Mississippi. It is a wholly-owned subsidiary of Sanderson Farms, Inc. During the Class Period, Sanderson Farms, Inc. (Processing Division), either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

27.     In this Complaint, Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division), and Sanderson

9

Farms Inc. (Processing Division) are referred to collectively as "Sanderson Farms" or "Sanderson."

### *Perdue*

28.     Perdue Farms, Inc. is a Maryland corporation with its headquarters in Salisbury, Maryland. During the Class Period, Perdue Farms, Inc., either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

29.     In this Complaint, Perdue Farms, Inc. is referred to as "Perdue."

### *Koch Foods*

30.     Koch Foods, Inc. is an Illinois corporation with its headquarters in Park Ridge, Illinois. During the Class Period, Koch Foods, Inc., either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

31.     JCG Foods of Alabama, LLC is an Alabama LLC with its headquarters in Park Ridge, Illinois. It is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, JCG Foods of Alabama, LLC, either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

32.     JCG Foods of Georgia, LLC is a Georgia LLC with its headquarters in Park Ridge, Illinois. It is a wholly-owned subsidiary of Koch Foods, Inc. During

10

the Class Period, JCG Foods of Georgia, LLC, either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

33.    Koch Meats Co., Inc. is an Illinois corporation with its headquarters in Chicago, Illinois. It is a wholly-owned subsidiary of Koch Foods, Inc. During the Class Period, Koch Meats Co., Inc., either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

34.    In this Complaint, Defendants Koch Foods, Inc., JCG Foods of Alabama, LLC, JCG Foods of Georgia, LLC, and Koch Meats Co., Inc. are referred to collectively as "Koch Foods."

***Wayne Farms***

35.    Wayne Farms, LLC is a Delaware LLC with its headquarters in Oakwood, Georgia. During the Class Period, Wayne Farms, LLC, either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

36.    In this Complaint, Wayne Farms, LLC is referred to as "Wayne Farms."

11

*Mountaire Farms*

37.     Mountaire Farms, Inc. is a Delaware corporation with its headquarters in Millsboro, Delaware. During the Class Period, Mountaire Farms, Inc., either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

38.     Mountaire Farms, LLC is an Arkansas LLC with its headquarters in Little Rock, Arkansas. It is a wholly-owned subsidiary of Mountaire Farms, Inc. During the Class Period, Mountaire Farms, LLC, either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

39.     Mountaire Farms of Delaware, LLC is a Delaware LLC with its headquarters in Millsboro, Delaware. It is a wholly-owned subsidiary of Mountaire Farms, Inc. During the Class Period, Mountaire Farms, LLC, either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

40.     In this Complaint, Defendants Mountaire Farms, Inc., Mountaire Farms, LLC, and Mountaire Farms of Delaware, LLC are referred to collectively as "Mountaire."

### *House of Raeford*

41.     House of Raeford Farms, Inc. is a North Carolina corporation with its headquarters in Rose Hill, North Carolina. During the Class Period, House of Raeford Farms, Inc., either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

42.     In this Complaint, House of Raeford Farms, Inc. is referred to as "House of Raeford."

### *Peco Foods*

43.     Peco Foods, Inc. is an Alabama corporation with its headquarters in Tuscaloosa, Alabama. During the Class Period, Peco Foods, Inc., either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

44.     In this Complaint, Peco Foods, Inc. is referred to as "Peco."

### *Foster Farms*

45.     Foster Farms, LLC is a California LLC with its headquarters in Modesto, California. During the Class Period, Foster Farms, LLC, either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

46.     In this Complaint, Foster Farms, LLC is referred to as "Foster."

### *George's*

47.     George's, Inc. is an Arkansas corporation with its headquarters in Springdale, Arkansas. During the Class Period, George's, Inc., either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

48.     George's Farms, Inc. is an Arkansas corporation with its headquarters in Springdale, Arkansas. It is a wholly-owned subsidiary of George's, Inc. During the Class Period, George's Farms, Inc., either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

49.     In this Complaint, George's, Inc. and George's Farms, Inc. are collectively referred to as "George's."

### *Fieldale Farms*

50.     Fieldale Farms Corporation is a Georgia corporation with its headquarters in Baldwin, Georgia. During the Class Period, Fieldale Farms Corporation, either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

51.     In this Complaint, Fieldale Farms Corporation is referred to as "Fieldale."

14

### O.K. Foods

52.     O.K. Foods, Inc. is an Arkansas corporation with its headquarters in Fort Smith, Arkansas. During the Class Period, O.K. Foods, Inc., either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

53.     O.K. Farms, Inc. is an Arkansas corporation with its headquarters in Fort Smith, Arkansas. It is a wholly-owned subsidiary of O.K. Foods, Inc. During the Class Period, O.K. Farms, Inc., either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

54.     O.K. Industries, Inc. is an Arkansas corporation with its headquarters in Fort Smith, Arkansas. It is a wholly-owned subsidiary of O.K. Foods, Inc. During the Class Period, O.K. Industries, Inc., either directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

55.     In this Complaint, O.K. Foods, Inc., O.K. Farms, Inc., and O.K. Industries, Inc. are collectively referred to as "O.K. Foods."

### Simmons Foods

56.     Simmons Foods, Inc. is an Arkansas corporation with its headquarters in Siloam Springs, Arkansas. During the Class Period, Simmons Foods, Inc., either

15

directly or through its wholly-owned or controlled subsidiaries and/or affiliates, sold Broilers in interstate commerce that were purchased throughout the United States.

57.     In this Complaint, Simmons Foods, Inc. is referred to as "Simmons."

                                        ***

58.     Each Defendant named above includes also each of the named Defendants' predecessors, including companies that merged with or were acquired by the Defendants and subsidiaries or affiliates thereof that sold Broilers in interstate commerce that were purchased throughout the United States during the Class Period.

59.     Throughout the Class Period, each corporate family of Defendants acted largely as a unit for the benefit of its parent corporation. Subsidiaries and affiliates of the corporate parents knowingly participated in the conspiracy for the benefit of their respective corporate parents. In this respect subsidiaries and affiliates of the corporate parents acted as agents of their respective parent corporations.

## JURISDICTION AND VENUE

60.     The Court has original federal question jurisdiction over the Sherman Act claim asserted in this Complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and

Section 16 of the Clayton Act, 15 U.S.C. § and 26. The Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

61.     This Court also has original jurisdiction over this suit pursuant to 28 U.S.C. § 1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1711 *et seq*. This is a multi-state class action in which the aggregate amount in controversy exceeds $5 million and in which the citizenship of any member of the class of plaintiffs is different from that of any defendant.

62.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c). During the Class Period many of the Defendants transacted business, were found, or had agents in this district. A substantial portion of the affected interstate trade and commerce alleged herein has been carried out in this District.

63.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each: (a) transacted business in this District; (b) has substantial aggregate contacts with this District; and (c) engaged in an illegal price-fixing and supply-restricting conspiracy and agreement involving Broilers that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

# FACTUAL ALLEGATIONS

**A. Introduction to the Broiler Market**

    1.    Definitions and Size of the Market

64.    Broilers are chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, raw or cooked, or whole or in parts, but excluding chicken that is grown, processed, and sold according to halal, kosher, free range, or organic standards and chicken sold for resale to be used as an ingredient in a value added product or serving.

65.    Broilers are a commodity product, with little or no product differentiation between processors. There is a single national U.S. market for Broilers, with prices quoted in whole bird or disassembled parts, adjusted for transportation, packaging, and value-added further processing.

66.    The U.S. Broiler market is immense. USDA reports annual statistics on the market: in 2015, the total wholesale value of U.S. Broilers was $28.7 billion. Over the Class Period, the annual market value never dipped below $21.8 billion.

67.    Almost the entire Broiler industry is vertically integrated, with Broiler producers owning or controlling nearly every step of production from breeding to sale. Broiler producers first purchase young breeding "pullets" from one of three

primary breeder or "genetics" companies: Cobb-Vantress (owned by Tyson), Hubbard, and Aviagen. Genetics companies carefully control their pullet lines, breeding them for desirable genetic traits such as a large breast or rapid growth. The Broiler producer then raises these pullets to lay eggs, which are incubated at a producer-owned hatchery and then sent to contract "grow-out" farms to be raised into adult Broilers. When the Broilers reach the desired age and size, they are transferred to a producer-owned processing plant and either delivered to resellers or sent to a "further processing" plant, e.g. to be turned into chicken nuggets.

68. The majority of Broilers are sold to customers under contract; roughly 17-20% are exported to other countries, particularly Mexico, Canada, Hong Kong, and China. What remains—usually 10-20% of Broilers—are sold on the "spot market" within three days.

69. Before the Class Period, it was common for producers to sell Broilers on relatively long-term fixed-price contracts. As detailed below, however, as part of Defendants' collusive agreement to restrict supply, the Defendants began to move their contracts in concert away from fixed-price models toward pricing based on the spot market. Today, the vast majority of sales are tied to Broiler spot market prices—according to one UC-Davis agricultural economist who looked at Pilgrim's Broiler sales, as much as 92% were tied to spot markets.

2.    The Collusion-Facilitating Structure of the Broiler Market

70.    The structure of the Broiler market is ripe for collusive pricing.

71.    As noted above, the industry is vertically integrated, with a handful of Broiler producers exercising tight control over nearly every step of the process. The industry is highly concentrated, with just the top nine Defendants' groups controlling more than 77% of the U.S. market. Potential new entrants face high barriers to entry, owing to the economies of scale available through vertical integration. A new competitor would have to invest enormous capital to enter the market in pursuit of an uncertain return. Moreover, Defendants have kept shuttered facilities idle rather than selling them, maintaining a threat of increased production at low cost against any potential newcomer. Competitors also have very similar corporate and cost structures, allowing each to easily compare costs and discern competitive information.

72.    Defendants' conspiracy is facilitated by an unprecedented information-sharing infrastructure provided by third-party co-conspirator Agri Stats, a subsidiary of Eli Lilly and Company.[1] Legitimate, pro-competitive information-sharing programs typically provide *historical* data on an *anonymous* basis, focusing on broad *aggregated* statistics that do not reveal competitively

---

[1] Eli Lilly is a major supplier of pharmaceuticals and vaccines to Broiler producers; its ownership of Agri Stats allows it privileged access to market data.

sensitive information about individual participants' businesses. Agri Stats, however, offers a treasure trove of *disaggregated* information on individual firms (whose identities are discerned by other industry participants). Agri Stats offers Broiler production statistics on a *daily* basis. Its offerings include detailed data, not only on price and production levels, but also on competitively sensitive data such as profit per live pound. Critically, Agri Stats also offers data on the size and average age of each producer's breeding flocks, allowing competitors to accurately predict Broiler production levels weeks into the *future*.

73. As discussed below, Agri Stats plays an active role in facilitating Defendants' conspiracy. For now, however, note only that the unprecedented level of detail available to each Defendant on their competitor's businesses allows Defendants to coordinate their production and police their collusive agreements.

74. Defendants also enjoy a multitude of opportunities for their executives to meet in person at business and social occasions, allowing plenty of forums in which Defendants could negotiate, coordinate, and troubleshoot their collusive agreement. In 2011 alone, for example, industry events and investor conferences provided Defendants with at least ten separate opportunities for face-to-face meetings, many of which included golf outings, dinners or other informal social events. If these were not opportunities enough, competitors also customarily

provided each other with plant tours, allowing rival executives to observe each other's business practices and to collude in person.

75.    Finally, the Broiler industry has a long history of collusion. In 1973, the Department of Justice filed suit under Section 1 of the Sherman Act against the National Broiler Marketing Association ("NBMA"), charging it and its members with conspiracy to fix Broiler prices. Civil suits followed, and were ultimately settled for approximately $30 million. Broiler producers have also faced antitrust scrutiny for their relationships with contract growers, over whom producers often have market power.

76.    These conditions and more make the Broiler industry particularly vulnerable to collusion. And in 2008, under pressure from increased feed prices and static demand, Broiler producers gave in to temptation, deliberately coordinating production decreases across the industry in an attempt to raise prices and profits. Their efforts succeeded and continue to the present day.

### 3.    Stable, Dramatically Higher Prices During the Class Period

77.    Traditionally, Broiler prices have been strongly cyclical: during periods of high demand, prices would increase, tempting Broiler producers to ramp up production swiftly; once the new production came online, prices would crash, forcing producers to decrease production and starting the cycle anew.



78.     Beginning in 2008, however—as Defendants began the conspiracy alleged herein—prices began to stabilize and to increase steadily. Gone were the cycles of boom and bust, because Defendants were coordinating production cuts among themselves, driving prices up while policing each other to ensure no Defendant increased production to take advantage of the artificially high prices.

79.     Defendants' agreement has increased Broiler prices by approximately 50% since 2008, and the boom and bust cycles have been smoothed almost out of existence.



80.    Notably, prices have increased even as the price of key inputs fell. Feed costs are the single largest component of the costs of Broiler production, representing up to 70% of total costs. In 2014, however, corn prices fell roughly 50% from 2013 highs, which should have led to a drop in Broiler prices. But Broiler prices actually *increased* 9.2% instead.

81.    Over the Class Period, Broiler prices have not represented the meeting of supply and demand in a vigorously competitive market. Rather, the steady increase in Broiler prices is the result of a collusive agreement among Defendants—an agreement to decrease Broiler production, in spite of each Defendant's individual self-interest, to increase prices and profit in this industry.

### B. PRE-CLASS-PERIOD PANIC OVER DECREASING PROFITS

82.     Prior to 2008, the Broiler industry was in trouble. Rising feed prices and static demand had eaten into Broiler producers' profit margins.

83.     In 2007, Pilgrim's and Tyson, the two largest Broiler producers, announced a decrease in production. Only three other producers—Foster, Peco, and Perdue—also did so. Other producers—Sanderson, Mountaire, and House of Raeford particularly—refused to cut production, driving down prices in late 2007 and early 2008.

84.     This abortive attempt to lead the market served as a lesson to Pilgrim's and Tyson—unilateral supply cuts would not raise profits; to raise prices, these companies would have to coordinate production cuts with the rest of the industry.

### C. THE FIRST WAVE OF COORDINATED PRODUCTION CUTS: 2008-09

85.     This they set out to do. Over the course of 2008, Defendants engaged on a set of systematic, coordinated production cuts in an effort to drive up prices. In this they were successful, driving Broiler prices up from mid-2008 to all-time highs through late 2009.

25

1.  <u>Days After an Industry Conference, Tyson and Pilgrim's Call for Cuts in Production</u>

86.  Each Defendant—in fact, companies representing 99.4% of U.S. Broiler production by major broiler companies—attended the annual International Poultry Expo in Atlanta, Georgia from January 23-25, 2008. Attendees included Defendants' senior executives.

87.  Three days later, on January 28, 2008, Tyson CEO Dick Bond announced his intention to "raise prices substantially." Of course, in a commodity market, suppliers cannot raise prices above market levels without losing significant market share, but Bond was calling for an industry-wide reduction in supply to drive prices up.

88.  Tyson's announcement was soon echoed by Pilgrim's. The next day, January 29, Pilgrim's CFO Rick Codgill said on an earnings call that the industry was oversupplying Broilers and hurting prices. Codgill said Pilgrim's had already reduced its production by 5%, and that "the rest [] of the market is going to have to pick-up a fair share in order for the production to come out of the system."

89.  Despite signaling that Pilgrim's would not unilaterally reduce supply, Codgill nonetheless laid out a plan for the industry to drive up prices—essentially an invitation for competitors to coordinate. Codgill noted that "[W]e've got to make sure that we get the supply in line with demand at an acceptable price, not just in line with what the customer wants to buy at a cheap price." One analyst,

26

Pablo Zuanic from JP Morgan, asked "Is it just that last year [Pilgrim's] we did it [cut supply] for the industry, and they didn't follow and now it's their turn?" to which Codgill replied "I think you kind of hit on it there. . . . It's not like we had 5% of surplus capacity that we could just reduce our operations and not feel that . . . I mean we cannot be the ones that are out there continually reducing production, and let the other producers capitalize on that. I mean if it's 5% last year, 5% this year, 5% next year, you can see that that's a spiral to the demise of our company, which we are not willing to accept."

90. Two days later, Sanderson joined the chorus. On January 31, Joe Sanderson, CEO of Sanderson Farms, told an analyst on a public call that "we could see some reductions in production." Sanderson noted that "There's still 25% of the industry still making money but I would expect to see . . . reductions come over the next 90 to 120 days." Sanderson's confidence on the industry's profitability reflects the unusually extensive information available to him through Agri Stats.

### 2. Encouraged by the Largest Producers' Calls for Cuts, Pilgrim's Sets Off a Wave of Supply Reductions

91. A few weeks later, on March 4, 2008, Defendants' senior executives met at the National Chicken Council's Board of Directors Executive Committee

meeting. The meeting included, at least, Pilgrim's CEO Clint Rivers, Tyson's Senior Vice President Donnie Smith, and Fieldale CEO Thomas Hensley.

92.     The next week on March 12, 2008, Pilgrim's announced massive production cuts, shuttering seven Broiler facilities to reduce the industry oversupply. Pilgrim's CEO Clint Rivers stated the closures were "absolutely necessary to help bring supply and demand into better balance." He noted that the "industry" could not continue to supply products "solely at pricing levels below the cost of production." This call to reduce production—combined with Pilgrim's earlier warnings that it would not again be caught in unilateral supply reductions— resonated with the rest of the industry. Rather than increasing supply in the wake of Pilgrim's cuts, they instead reduced production in a string of public announcements.

93.     Fieldale announced a 5% production cut on April 3, 2008, with CEO Tom Hensley noting that "We're hoping this cut puts supply and demand back into better balance"—a hope that makes no sense absent an expectation of industry-wide cuts.

94.     On April 9, 2008, Simmons announced a 6% production cut, citing increased corn and soy prices. The next day, Cagle's Inc. (now owned by Koch Foods) announced a 4% production cut. By April 11, 2008, Wayne Farms, O.K.

Foods, and Koch Foods had each announced significant reductions, ranging from 2-8%.

95.     Several other Broiler producers cut production over the next few weeks without public announcements. Nonetheless, news of the Broiler supply reductions were communicated throughout the industry through Agri Stats and/or other back channel communications. On May 28, 2008, at a BMO Capital Markets Conference, Joe Sanderson of Sanderson Farms revealed, "we have seen for the last 6 or 7 weeks . . . some companies in our industry announce cutbacks. There have been I think six companies have announced cutbacks. I know some companies have cut back and have not announced."

        3.    <u>Having Received Cooperation From Other Suppliers, Pilgrim's Arranges Deeper Cuts With Longer-Term Commitments Throughout the Industry</u>

96.     With other producers having signaled their assent to coordinated industry-wide cuts in response to Pilgrim's initial reductions, the industry took further steps to raise prices with production cuts. On April 11, 2008, Pilgrim's suggested that it would close its processing plant in El Dorado, Arkansas, a huge facility with more than 1,500 workers. Three days later, it announced a 5% reduction in egg sets.

97. By April 29, Dick Bond of Tyson felt confident telling an analyst "I think the industry has changed. . . . we have seen some sizeable declines here lately in egg sets and placements."

98. On May 15, Clint Rivers of Pilgrim's called for other companies to cut production in sync with his own. At a speech at the BMO Capital Markets Ag & Protein Conference, Rivers said he would like the Broiler industry to continue its supply cuts and "trim total production by 3%-4%, calling it a prudent move in light of recent price volatility in the grain markets." He noted that the "cuts need to be fairly deep." Dick Bond from Tyson was in attendance, as were Joe Sanderson and CFO Mike Cockrell from Sanderson Farms. A week later, on May 21, the Wall Street Journal noted that "Companies are cutting production, weekly egg-set numbers are declining . . . and prices are responding positively to the thinning supply lines." The article also noted "[i]t is unusual for egg sets to decline at this time of year."

99. On a May 22 earnings call, Sanderson announced a 4-5% production cut. Though CEO Joe Sanderson insisted that "we always [make cuts] after Labor Day," he admitted that usually "we don't announce that." This year, in the midst of public commitments to reduce supply industrywide, Sanderson chose to join the coordinated public effort. Sanderson would eventually implement these cuts a month early. Six days later at the BMO Capital Markets Conference, Sanderson

mentioned (to an audience that included other Defendants' executives) that he had observed many cuts from other companies as well.

100. Rivers (of Pilgrim's) made another call for cuts in a June 4 presentation, noting that "we are oversuppl[ied]" and "need some balance in the supply. . . . Simply put, at this time there is still too much breast meat available to drive market pricing significantly higher."

101. As noted, by this time the Wall Street Journal had recognized that "prices are responding positively to the thinning supply lines." Nevertheless, Broiler processors continued to cut supply at Pilgrim's prompting. On June 19, 2008, on a media call, Mark Hickman, the CEO of Peco and Chairman of the National Chicken Council, told participants that "the poultry industry is entering a second phase of production cutbacks, following a 1 percent to 2 percent cutback in production earlier this year. 'We are hearing talk that this was not nearly enough, so liquidation is in round two.'"

102. Hickman's use of the word "liquidation" is important. It signals a longer-term commitment to supply reduction. Rather than simply reducing egg sets or spacing them further apart—supply reduction strategies that allow for rapid increases in production if necessary—Hickman's "liquidation" refers to the large-scale reduction of breeder flocks, which take a long time to rebuild. Hickman was thus signaling an industry-wide commitment to long-term, irrevocable supply

31

reductions, to be confirmed through Agri Stats's detailed competitor data on breeder flocks.

103.    Four days later, Wayne Farms announced further reductions in Broiler production of 6%, citing a need "to rationalize our business."

104.    On June 23-25, 2008, Defendants' executives attended the U.S. Poultry & Egg Association's ("U.S. Poultry") annual Financial Management Seminar. The next week, on July 2, Foster Farms announced a halt on plants to build a new Broiler plant in Colorado. Foster had planned to employ 1,000 people at the plant, making its loss a significant dent in production. A few days later, on July 7, July 7, 2008, O.K. Foods announced a 7.5% reduction in egg sets.

105.    On July 20-22, Defendants' senior executives attended the National Chicken Council's "Chicken Marketing Seminar." The seminar included "social networking events and recreational opportunities, including a golf tournament."

106.    On July 31, 2008, Tyson cancelled a contract with Petit Jean Poultry for Broiler Processing in Buffalo, Missouri. Tyson told Buffalo that no amount of incentives could convince it to renew its contract.

107.    On August 11, 2008, Pilgrim's announced that it would close its processing plant in Clinton, Arkansas. Pilgrim's press release noted the closures "are part of the company's ongoing effort to . . . return to profitability amid high feed costs and an oversupply of chicken on the market." The Clinton plant's

closing further reduced Pilgrim's total production by 1.25%. Pilgrim's also noted that "[w]ith Labor Day approaching and no indication that the actions taken to date by Pilgrim's Pride or other industry members are having a positive effect on selling prices for our products, it is now clear that more significant decisive action is necessary."

108. Joe Sanderson picked up Pilgrim's call for further cuts. On an August 26, 2008 call, Sanderson stated that "[s]o long as this weakness continues, the poultry industry will need to cut production further until supply is in line with demand." Speaking to the industry as a whole, Sanderson noted "we kind of thought we were going to see reductions in July . . . [based on] 213/214 [million] eggs sets back in April and that really did not materialize. When you look at USDA slaughter numbers in July, they were 100% and 101% and now we're looking at egg sets of 206 and 207 million that are going to show up sometime in October or November. We'll see when we get there. Those are barely impressive cuts. My suspicion is, as I've told you in May, the industry typically make the cut [sic] and it's tentative. We'll have to see if it works. . . . I'm very skeptical that those cuts are going to be enough to return us margins to cover these grain costs."

109. On September 23, 2008, Pilgrim's then executed additional cuts, laying off an additional 100 employees at its processing plant in El Dorado, Arkansas.

33

110. Defendants' senior executives again converged at the National Chicken Council's Annual Meeting on October 3, 2008. Agri Stats CEO Bill Snyder moderated a panel with the CEOs of Pilgrim's, Tyson, Perdue, and Sanderson Farms. At the panel, Pilgrim's CEO Clint Rivers insisted, "[w]e need to get those [input] costs pushed through, but we've yet to see that happen." A week later, Pilgrim's spokesman Gary Rhodes said of reports of falling egg sets, "[t]his is very positive news for the industry and may signal that the industry is taking a more rationalized approach to production heading into the fall."

111. On October 18, 2008, Wayne Farms announced it would close a plant in College Park, Georgia, laying off more than 600 employees.

112. On an earnings call on November 10, 2008, Tyson CEO Dick Bond said that Tyson would not be cutting production further because it had already done its part in cutting production the year before. Two days later, industry analyst Ken Zaslow noted that "[t]he industry has cut about 10 to 12 percent of its production."

113. Despite its November assurances, Tyson reduced production in December 2008. On December 18, Tyson cancelled another contract with Petit Jean Poultry, this time at a processing plant in Little Rock, Arkansas, forcing the layoff of 700 employees. By December 23, Tyson had cut production by 5%. A

34

Tyson spokesman noted that they "continue to closely evaluate market conditions in an effort to match customer demand with our supply."

114. Roughly one year after the first calls for production cuts, Defendants' senior executives again attended the International Poultry Expo in Atlanta Georgia, on January 28-30, 2009.

115. In an interview on February 18, 2009, Tyson Senior Vice President Donnie Smith recognized that "[a]cross our industry, we're down about six percent versus where we were a year ago. We're seeing an impact from that on market prices . . . the industry fundamentals are improving."

116. A late February 2009 report noted that Pilgrim's had made further 9-10% cuts in its production. Around this time, Sanderson noted to a group of investors that "[b]ecause we don't expect much help from the demand side, chicken market improvement will have to come from supply cuts." And on February 25, 2009, Simmons CEO Todd Simmons said in an interview that "[w]e are seeing lower demand in the food-service customer base. We have made adjustments in bird weights to ensure our production meets with our customer's needs."

117. Finally, having been reassured by continued cuts from other producers, Pilgrim's announced historically large cuts to its production on February 27, 2009. It shuttered three processing plants in Douglas, Georgia, El

35

Dorado, Arkansas, and Farmerville, Louisiana. Pilgrim's said the closures would "improve the company's product mix by reducing commodity production and to significantly reduce its costs in the midst of an industry-wide oversupply of chicken and weak consumer demand resulting from a national recession." These three plants' closures reduced Pilgrim's overall Broiler production by 9-10% in total pounds.

118. Over the course of fourteen months, at least 11 companies reported cut production, including Defendants Tyson, Pilgrim's, Perdue, Simmons, House of Raeford, George's, and O.K. Foods. Other companies reduced their planned production levels and/or delayed the planned opening of new Broiler complexes.

### 4. The 2008-09 Cuts Are Deeper in Kind Than Previous Industry Cutbacks, Establishing Longer-Term Signals and Reduction Commitments

119. In addition to dramatically reducing Broiler production during a period of more or less overt public signaling and constant meetings among top Broiler executives, the 2008-09 cuts are notable because they introduced the industry to a new technique for coordinated cuts—reducing breeder flocks, forcing long-term supply reductions competitors could see and plan on.

120. Broiler breeder flocks are kept in active "lay" for an average of 65 weeks, so a breeder hen produces an average of 140 eggs over an average lifespan that are incubated at Broiler producer-owned hatcheries. Breeder flocks are

36

created from a limited pool of grandparent flocks from the three Broiler genetics companies (Tyson's Cobb-Vantress, Aviagen, and Hubbard), so it takes substantial time to re-populate a Broiler breeder flock that has been reduced through early slaughter. By reporting the size of each Defendant's supply flocks through Agri Stats, Defendants monitored each other's breeder flock reductions. This allowed Defendants early warning if a co-conspirator ramped up production in conflict with Defendants' conspiracy.

121. Ordinarily, Broiler producers who limit supply would choose methods that would allow a quick ramp-up if prices increased. The slaughter of Broiler breeder flocks throughout the industry in 2008-09, however, was unprecedented:



5.   Defendants' Successful Execution of the Collusive Agreement
     Increases Prices and Returns the Industry to Profitability

122.   In response to the industry's coordinated supply cuts, Broiler prices

rose through mid to late 2008, staying at or near all-time highs until late 2009.

Sanderson Farms reported profits in 2009 that were *double* analysts' predictions.

An industry publication noted the unexpected profit was "aided by production cuts

and lower feed costs that offset still-weak demand." At a May 14, 2009 BMO

Capital Markets conference, interim Tyson CEO Leland Tollett noted that "poultry

market fundamentals had improved.  Pullet placements, an[] indication of future

38

Broiler supplies, have been down the past five months compared to the same period last year. Egg sets continue to run six percent or more below year ago levels and cold storage inventories of poultry have declined about 20 percent since peaking in November 2008."

### D. THE SECOND WAVE OF COORDINATED PRODUCTION CUTS: 2011-12

123. Prices continued to rise during late 2009 and early 2010. In response, Broiler producers gradually increased production in response to higher prices. Slowly, in late 2010 Broiler prices began to decline. Rather than letting competitive pressure increase supply and drive down prices, however, Defendants, who now knew the advantages of a collusive supply reduction, rushed to replicate their success. In the first half of 2011, they quickly announced new production cuts, again driving prices to record highs.

124. On January 24-26, 2011, senior executives of Defendants' companies again gathered at the International Poultry Expo. At the IPE's "market intelligence panel," Agri Stats economist Mike Donohue noted, according to one report, that "'2008 was the worst year financially for the (U.S.) broiler industry that most people have ever seen' . . . The industry's response in 2008 was a 5 to 6% reduction in pounds produced. He said that the broiler industry is currently at record high weekly slaughter volumes." Paul Aho, another industry veteran, said

that "[t]his could be a very difficult year with cutbacks, rationalization, and consolidation . . . . The market is calling for around a 5% reduction in chicken production."

125. Soon afterward, on a February 4, 2011 earnings call, Tyson COO James Lochner noted that "until industry supply more closely aligns with demand" Tyson's Broiler business would "be challenged." Tyson CFO Dennis Leatherby also referred to a supply-demand imbalance in the chicken industry.

126. Around this time, Tyson implemented a new business strategy it called "Buy vs. Grow." Under Buy vs. Grow, Tyson bought excess production from smaller competitors to avoid allowing this production to flood the market. Tyson communicated its purchase volumes in advance, thus signaling to its competitors how much production Tyson would be willing to absorb in future months. The intent was for competitors to adjust their production volumes accordingly. Though it would have been cheaper for Tyson to produce its own Broilers through its well-integrated system, the Buy vs. Grow program allowed Tyson substantial control over Broiler industry supply volumes and allowed it to keep prices artificially high.

127. On February 16, Cagle's (now Koch Foods) announced a 20% supply reduction at one of its deboning operations. Cagle's told one publication that it was "optimistic that the industry will exhibit the production restraint necessary to

40

support higher pricing for Cagle's products allowing for return to profitable margins."

128.  Joe Sanderson of Sanderson Farms announced around February 25, 2011 that Sanderson would be delaying the development and construction of a planned North Carolina Broiler complex.

129.  On March 7, House of Raeford announced a 10% reduction in egg sets that began in early February.  CEO Bob Johnson noted, "we decided that acting now was a responsible action for our company in light of continuing unstable economic conditions. . . .  Hopefully the chicken prices will begin to increase later this year."

130.  On March 15, Simmons joined the movement, laying off 180 workers at its processing plant in Siloam Springs, Arkansas.

131.  On April 13-15, 2011, the Georgia Poultry Federation held its annual meeting at the Brasstown Valley Resort in Georgia.  Defendants' senior executives attended the meeting.

132.  On April 15th, Mountaire Farms announced that it would abandon plans for a 3-5% capacity increase. Paul Downes, Mountaire's President, was blunt: "The only way to higher prices is less supply.  The only way to less supply is chicken companies will shut down or cut back."

41

133. On May 1-3, 2011, Defendants' senior executives, including Tyson CEO Donnie Smith, attended Urner Barry's Annual Executive Conference and Marketing Seminar, which includes an annual golf outing at a local country club. On May 17-18, 2011, senior executives from Sanderson Farms (Joe Sanderson and President and CEO Lampkin Butts), Pilgrim's (President and CEO Bill Lovette), and Tyson (Donnie Smith and Senior Group VP Noel White) attended the BMO Farm to Market Conference. Pilgrim's Bill Lovette presented at the conference, noting Pilgrim's shift away from fixed-price contracts to contracts based on spot market prices.

134. On a May 24, 2011, earnings call, Joe Sanderson stated "the deal is that the industry — forget Sanderson — the industry cannot sustain losses like they are sustaining for a long period of time. They will — they can't do it and you have been observing this for years and years and the industry has been losing money since Novemberish and balance sheets deteriorate and losses have to stop. The only way to stop losses with $7 corn is to reduce production and get prices up. That is the rule and the law of the jungle. . . . [M]y judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats."

135. Cagle's pled on a June 6 earnings call that "[t]he industry must lower supply in order to offset reduced demand and to support higher market prices.

Cagle's continues to process at 80 per cent of capacity at its Pine Mountain Valley deboning facility and does not contemplate any increase in the foreseeable future."

136.   The next day, on June 7-10, 2011, the United States Poultry & Egg Export Council ("USAPEEC") held its annual meeting at The Greenbrier America's Resort in West Virginia.  Defendants' senior executives attended.

137.   Weeks later, around June 20, Tyson reduced production weeks into the future by pulling eggs from its incubators. On June 21, Cagle's announced further layoffs of 300 workers at its Broiler facility in Pine Mountain Valley, Georgia.

138.   On June 27-29, 2011, the US Poultry & Egg Association held a Financial Management Seminar at the Ritz Carlton in Amelia Island, Florida, attended by Pilgrim's President and CEO Bill Lovette and other senior executives of Defendants.

139.   On June 27, 2011, Simmons announced that it would lay off 223 employees at its Siloam Springs, Arkansas plant.

140.   On July 12, 2011, Tyson's Donnie Smith, Tyson executive Bernard Leonard (Chairman of the NCC at the time), Sanderson Farms COO Lampkin Butts, Peco CEO Mark Hickman, and Perdue Farms CEO Jim Perdue participated in a panel together at the 2011 Food Media Seminar.

141. On July 29, 2011, Pilgrim's announced that it would shutter its Dallas, Texas processing facility, laying off 1,000 employees. Lovette blamed the closure on "the challenges facing our industry from record-high feed costs and an oversupply of chicken."

142. On an August 1 earnings call, Sanderson said that its normal fall production cut of 4% beginning in November would remain in place beyond January of 2012 and until demand improves. Sanderson also stated "we aren't going to set any more eggs until we pick up a big account or we can't supply our customers' needs. We think demand improvement will require unemployment to drop . . . . It wouldn't surprise me if the industry makes further, deeper reductions in egg sets in October or November," he said. Though "[n]obody knows what cuts might be needed until we get to October," Sanderson said, "I think that the cutbacks may need to be more than the 6% in head that the industry already has in place."

143. A week later, on August 8, Tyson's Donnie Smith said that "[d]omestic availability must be in balance with demand before industry economics can improve. Tyson continuously strives to match our supply to demand and as a result we made a production adjustment in the third quarter. . . . Our goal is to match supply to demand. And following overproduction the

industry experienced, we cut production in the third quarter, but those cuts have not yet impacted the market."

144.   On August 18, Cagle's announced a 20% reduction of production at its large Pine Mountain Valley, Georgia plant.

145.   On October 5-7, 2011, the National Chicken Council threw its Annual Conference, with Defendants' senior executives in attendance. A panel including Defendants Perdue and Koch Foods celebrated the "new paradigm" in the Broiler industry. According to one report, the panel stressed "[d]iscipline on the supply side."

146.   On November 17, Wayne Farms announced it would close its Decatur, Alabama plant and lay off 360 employees.

147.   On a November 21, 2011, earnings call, Joe Sanderson responded to a question about a production decrease that "when we talk about the 4% number, that is what we project the industry to be.  Obviously, we're going to be a part of that."

148.   On December 6-8, 2011, the USAPEEC held its annual winter meeting, attended by Defendants' senior executives.

149.   Sometime in 2011, Fieldale Farms cut its production, though it did not specify when or the extent of the cuts.

45

150. U.S. Poultry held its Hatchery-Breeder Clinic in January 2012. During the clinic, Agri Stats's Mike Donohue noted the importance of reducing Broiler breeder flocks, saying "if the industry chose to do so, it could ramp up production within a 10-week period of time. The industry could blow apart any recover[y] in the short term by filing up incubators again," but noted that Agri Stats data indicated the industry was slaughtering breeder flocks weeks earlier than usual, which suggested to him the industry was managing its production carefully. By slaughtering breeder flocks early, Defendants ensured an 18-month ramp-up time for production rather than a 10-week pathway.

151. On January 25-26, 2012, Defendants' senior executives again attended what was newly crowned the International Poultry and Processing Expo in Atlanta. The National Chicken Council held its Board of Directors meeting in conjunction with the meeting. Around this time in early 2012, Sanderson Farms cut its production by 4%.

152. The National Chicken Council Board of Directors met in Washington D.C. on March 20-21, 2012, again with Defendants' senior executives in attendance.

153. By April 27, 2012, Pilgrim's Bill Lovette felt comfortable on an earnings call bragging that "the die is cast for 2012," and that "we're comfortable that the industry is going to remain constrained." Two days later, from April 29-

May 1, Defendants' executives attended Urner Barry's Annual Executive Conference and Marketing Seminar.

154. Nonetheless, Pilgrim's continued to lay off workers, announcing on June 6 that it would cut 190 jobs at its deboning facility in Chattanooga, Tennessee.

155. On June 21, 2012, the National Chicken Council Board of Directors held its summer meeting at the Ritz-Carlton Highlands in Lake Tahoe, California. Defendants' senior executives attended the meeting.

156. In an article on July 9, 2012 Tyson CEO Donnie Smith said "the company will not over produce chicken at these expensive grain levels, preferring to buy commodity pieces in the secondary market to fill orders where necessary."

157. On July 15, 2012, the National Chicken Council's Marketing Committee met at the Stone Mountain Lodge in Stowe, Vermont, with Defendants' senior executives in attendance.

158. On August 6, Tyson's Donnie Smith said on an earnings call that "[o]ver the past couple of years we have substantially reduced a number of fixed price contracts we have with customers and currently have less than 15% of our Poultry volume [on] annual fixed price contracts. The vast majority of our contracts are tied to specific markets or allow for conversations about adjusting prices to move – prices to offset higher input and we will continue to push for even

47

more of these types of contracts. I believe supply will begin to rationalize as well, making it easier for us to have those pricing conversations."

159. On August 23, Koch Foods CEO Joseph Grendys stated in a Bloomberg News interview that "[c]osts have gone up so much due to the drought that the industry will be forced to get price increases of 10 to 15 percent across all product lines" for 2013. He went on to note that "'[t]he industry needs to be smart' and focus on pricing to ensure it remains profitable." The article also mentioned Koch was going to use quarterly adjustments for price in its contracts for the first time since 2008.

160. On August 28, Sanderson announced a further 2% reduction in Broiler production.

161. By September 2012, nearly two years of coordinated production cuts had stabilized prices, which quickly rose again. Not only had Defendants undertaken coordinated production cuts to save money in a high-cost environment; rather, Defendants had made unprecedented reductions in their breeding flocks to signal long-term decreases and commitment to the common goal of reducing supply. Breeder flocks reached their lowest level in more than a decade:



**E. DEFENDANTS CONGRATULATE THEMSELVES ON THEIR CONSPIRATORIAL "DISCIPLINE," REAP RECORD COLLUSIVE PROFITS, AND MAINTAIN THEIR CONSPIRACY**

    1.    <u>The Aftermath of the 2011-12 Production Cuts</u>

162.    Owing to Defendants' long-term collusive commitment to supply restraints, the Broiler industry reaped record profits from late 2012 through 2014. This spurred a period of self-congratulation, in which the Defendants celebrated their "discipline" in adhering to their collusive agreement.

163.    On May 3, 2013, Pilgrim's President & CEO Bill Lovette said on an earnings call, "Well, obviously, revenue is going to be a function of price, in part, and in this case a big part; and obviously, price is going to strengthen as supply

continues to be disciplined and constrained . . . . So I think the industry is doing an admirable job in being disciplined on the supply side and I think we've got a combination where we combine that discipline with strong demand for product and that's why you've seen the pricing environment that we're now enjoying." Lovette also commented that "I believe the industry has learned over the past three to five years that chicken economics is going to be driven by the supply and demand of chicken and not necessarily what corn or soybean meal costs. I think I'm confident to say we've, we figured that out and we're doing a good job of balancing supply and demand."

164. Lovette also discussed the importance of continued restraint of the industry's breeder supply flock, noting "[w]ell, I only know what we've seen happen in the past. Now, certainly, this summer if the industry chooses to grow the breeder supply significantly, that's definitely going to impact 2014. What I'm saying is, so far, we've seen no indication that the industry plans to grow the breeder supply and as a matter of fact, it's actually shrunk. So that's the source of my comments. Do I know what's going to happen in June or July or August of this year with respect to breeder placements, I don't know that. I would tell you that based on the last three to five years, though, again, I'll reiterate that I think the industry has learned that the economics of our business is tied very closely to the supply of chickens and we've done a good job so far of maintaining discipline such

50

that even paying nearly $8.50 for corn, we've been able to be profitable as an industry."

165.   On an earnings call on January 31, 2014, Tyson's Donnie Smith reported that through Tyson's "buy versus growth strategy we continue to keep our supply short of demand . . . ."

166.   On a February 21, 2014, earnings call, Lovette noted that "I think the one thing that . . . has created that stability is the discipline of the industry to not allow profitability in the past to drive supplies in the future.  I think we all have an understanding that our industry is mature, especially in the U.S.  Consumption of total meat in the last five years has not grown and our growth in the future is going to come from markets outside the U.S.  And so, we have a different model today than we had 15…10 or 15 years ago in that consumption in this country is not growing as robustly as it used to.  And I think that discipline really, Ken, is the one ingredient that has made for more stable earnings that we have seen."

167.   Reflecting the long ramp time for breeder flocks, on March 12, 2014, Donnie Smith predicted to attendees at an industry conference that "[a] 'meaningful change' in bird production won't occur until the second half of 2015." Industry analysts also recognized the sea change brought about by coordinated reductions in breeder flocks. One analyst said in a May 2014 interview that historically "it has been very easy to increase the chicken supply because the cycle

is so short. It only takes four to eight weeks to grow a chicken, but U.S. chicken producers are having a hard time increasing the chicken supply by much. They cut production capacity throughout the supply chain when grain prices were very high. Because of this, they cannot materially increase supply for 2014. We likely won't see a material increase in production until the second-half of 2015."

### 2. Defendants Continue to Artificially Depress Supply

168. Despite record high prices and profits, in 2013 and 2014 Defendants continued to find excuses to keep Broiler supplies low. When avian flu hit Mexico, Defendants exported substantial hatchery flocks to repopulate Mexican flocks rather than using the birds to increase U.S. supplies. Exports continued into 2015, despite higher prices available domestically. In the absence of a collusive agreement, Defendants would have been much better off hatching eggs domestically and increasing Broiler supplies.

169. In a July 2016 call, Lovette again touted his "confidence that we're going to do the right thing with respect to maintaining [] discipline. We've certainly had the hatching egg supply to grow much more if we chose not to export those eggs. I think in May we exported 81 million hatching eggs or so outside of the country. The industry could have chosen to set some of those eggs domestically, but that was not the choice that was made. And so again that gives us confidence that we're going to continue to be disciplined as an industry."

52

170.    Defendants' slow production growth in the face of increasing demand almost seemed to frustrate one industry analyst, who noted on October 1, 2014:

> Broiler product demand should remain robust through the rest of this year and well into 2015, bolstered by a gradually improving domestic economy, continued strength in export demand, and the towering prices of beef and pork.  Broiler production, however, has been slow to respond, with integrators having had problems expanding the number of chicks placed for growout.  Broiler meat production is on track to grow just 1.5 percent in 2014 from a year ago, with a similarly modest gain expected for 2015.  Producers have been somewhat constrained in their attempts to expand the nation's chicken flock by the limited supply of broiler hatching eggs.  When the broiler-producing industry reduced production in 2011 and 2012, the hatchery supply flock was also reduced, and it has not yet been rebuilt to prior levels.  Following seven months of [Year-over-Year ("YoY")] declines, the number of chicks placed for growout finally posted a modest 1 percent YoY gain in August.  However, it will take another 6-9 months for integrators to rebuild the supply of broiler hatching eggs in preparation for expanding the overall flock, so significant growth in broiler production will not materialize until late-2015 or early-2016."

171.    On October 10, 2014, Mike Brown, president of the National Chicken Council, wrote an op-ed in The National Provisioner. Brown wrote, "current favorable market conditions would normally stimulate production to be somewhat higher, that is, a percentage more aligned with the long-run annual average of 4 percent.  So why are chicken producers not stepping up production to better match the long-term average of 4 percent? We would if we could, but we can't.  We would like to produce more pounds of chicken, but unfortunately we are not there yet." Brown blamed the national Renewable Energy Standard—an industry

53

scapegoat—and other canards. In reality, Broiler producers' failure to grow production in the face of high prices was quite deliberate.

172. Reflecting Broiler producers' decreased breeder hen flocks, in October 2014 Simmons was forced to close its spent hen processing plant in Jay, Oklahoma. The plant processed breeder hens at the end of their productive life cycle. But reduced hen flocks meant insufficient business to sustain the plant.

173. Defendants continued to depress supply through 2014 and into 2015, particularly by exporting hatching eggs and Broilers to foreign markets. Tyson continued to exert control in the market with its Buy vs. Grow program, and occasionally closing plants or breaking eggs.[2] On the whole, however, Defendants' prior agreement to reduce breeder flocks affected most of the supply constraint.

174. The emergence of avian flu did cause a hiccup in the industry's considerable profitability. Though U.S. Broiler flocks were generally unaffected, several major export markets banned U.S. birds, including China and Korea. These bans caused a buildup in inventories, threatening high prices. Rather than selling their inventories domestically, however, Defendants colluded to dump excess Broilers into foreign markets. In October 2015, for instance, an inquiry into U.S.

---

[2] Tyson, for instance, announced on May 4, 2015 that it would close its Broiler facility in Buena Vista, Georgia and eliminate a shift at its Dawson, Georgia plant. It announced in May 2015 that it would reduce production after July 2015, then keep production flat through 2016, making up for increased demand with Buy vs. Grown purchases.

Broiler producers revealed that Broiler companies were selling chicken thighs in Vietnam for less than a third of the price of a similar product in the U.S., excluding transport and import fees. Vietnamese Broiler producers determined this practice cost them $120 million over 16 months.

175.    During the avian flu crisis, Broiler producers also chose to break eggs rather than incubating them, keeping an eye on each other's production through Agri Stats.

176.    Prices remained flat and high throughout most of 2015. Some industry observers were baffled. Watts PoultryUSA, in its March 2016 issue, called Tyson's $40.6 billion in sales on *lower* chicken production than 2014 a "paradoxical performance." PoultryUSA ascribed the profits to the way "Tyson, along with other top U.S. broiler companies, is redefining its business model to achieve profitable growth." This is a correct assessment, in a way, but neglects to mention that the new "business model" for the Broiler industry is a collusive cartel exerting strong downward pressure on production to extract artificially high profits.

177.    So far in 2016, Broiler prices have declined slightly, but industry magnates continue to tout Broiler producers' "discipline." For instance, during a February 2016 earnings call, Pilgrim's CEO Bill Lovette noted that "[t]he industry continues to be disciplined in terms of U.S. supply.  Although monthly pullet data tend to be volatile and have occasionally been at the high end of our expectations,

we see modest growth of the breeder flock, and more importantly, little to no increase in egg sits and chick placements as a positive. We believe that at least part of the reason is because chicken producers are being disciplined and are much quicker to react than in the past and in adjusting supply growth to the actual market conditions."

178. On an April 2016 earnings call, an analyst asked Lovette to "elaborate" on Lovette's past comments that the industry has been disciplined, and what "drives that view and then maybe what gives you confidence that this discipline will hold." Lovette responded, "What drives the view is the actual numbers that we see, ready to cook pounds are up about 3.1% year to date. If you look at placements year to date, they're up 1%, egg sets up 0.7%, hatchery utilization actually declined in Q1 to 91%. So in the phase of coming off two of the most profitable years in the industry, we're not seeing, not realizing large amount of production increases." Pilgrim's CFO Fabio Sandri added that "what drove that I believe it is that industry is more geared towards profitability rather than just market share or field growth."

179. In July 2016, Lovette noted that "I think what we've seen with egg sets is absolutely a testament to the discipline of our industry that we've seen the last really two to three years."

56

180.    During 2016, moreover, input costs have decreased substantially, though Broiler prices remain relatively steady. These factors are driving substantial profits—in fact, in May 2016 Tyson posted record quarterly growth, with profit margins for Broilers rising to between 9 and 11 percent.

181.    As a result of the collusive agreements described above, Defendants successfully avoided the industry's historical boom and bust cycles and acted as a coordinated unit. As a result, according to one observer, "[t]he profit margins of the nation's biggest meat packers rose dramatically between 2008 and 2010 (the most recent year for which good data is available), even as the national economy cratered. Tyson Foods, the nation's biggest meat company, reported record profits of $778 million last year [i.e., 2013] as the company hiked prices for beef, pork, and chicken."

182.    Bill Lovette summed up the previous seven years of coordinated industry effort on a February 12, 2015 earnings call: "I looked at some numbers supplied by Agri Stats earlier in the week and found some interesting facts. If you go back to 2008, the industry slaughtered 8.35 billion head. And by 2011, that slaughtered head had declined by approximately 8% to 7.7 billion. And it's actually remained about that same level through 2014 at about 7.7 billion. If you look at live weight pounds produced, it was 47.1 billion in 2008. It declined to 45.06 billion in 2011. And in 2014, for the first time since 2008, it reached 47.3

billion, so only 200 million more pounds above 2008 levels. And then on the average weight side, the average weight in 2008 was 5.64, and it's averaged just above 6 from 2011 through 2014. So with all of that data in mind, what it tells me is the industry remains fairly disciplined on the supply side and demand has been increasing for chicken against the backdrop of increasing beef and pork supplies."

183.   This "discipline" has cost Plaintiffs and Class Members untold sums in artificially high Broiler prices.

## F. THE BROILER MARKET'S RIPENESS FOR COLLUSION ("PLUS FACTORS")

184.   A brief introduction to the Broiler market has already suggested its vulnerability to collusion. This Section of the Complaint specifically organizes the "plus  factors" making collusion even more plausible in light of the allegations above.

### 1.   The Industry Is Highly Integrated and Highly Concentrated

185.   As alleged above, nearly all Broilers are produced by vertically integrated companies. Broiler integrators control nearly every aspect of the breeding, hatching, rearing, feeding, processing, and selling of Broilers. Even the "grow-out" farms, which are not owned by Broiler companies, are controlled and overseen by Broiler producers, who provide grow-out farms with feed and chicks,

monitor the Broiler's progress and health, pick up the chicks after grow-out, and

transport them to a producer-owned processing plant:



186.   As one former expert witness for Tyson put it:

> In the poultry industry vertical coordination allows integrators to
> manage excess capacity to manage price.  Integrators can minimize
> the effect on producers by increasing the time between collection and
> delivery of birds or reducing the number of flocks per year rather than
> terminating grower contracts in much the same way the USDA
> requires all commodity program recipients to adhere to acreage
> reduction program guidelines and grower associations require
> members to cut back marketable output.

This arrangement also creates high barriers to entry, similar cross-industry cost

structures, and strong incentives for collusion.

187.   As a result, the industry is growing more and more concentrated. Though in 1995 the U.S. was home to 55 integrated Broiler companies, only 41 survived into 2010. By 2014, only 35 remained. Moreover, the top producing companies seem to capture an ever-increasing share of the business:



188.   The Defendants represent 88.5% of U.S. Broiler production as of 2015. Market share has been stable over the class period, despite some loss of market share in Pilgrim's and the increase in Koch Foods's market share after its acquisition of Cagle's.



189. Broiler companies also deliberately mask consolidation to escape scrutiny by the Department of Justice. Rather than risk antitrust scrutiny by acquiring small Broiler companies, Tyson and other large producers sign long-term contracts with "zombie" Broiler companies in which the large companies purchase large portions (sometimes all) of a smaller company's output, giving the large company effective control over its smaller rival. These arrangements often include provisions allowing large Broiler companies to install employees at smaller company plants to oversee the details of production.

2. <u>Tyson's Vise Grip on Breeder Hens Gives It Leverage With Which to Discipline Competitors</u>

190. Broiler producers rely on a handful of unique Broiler breed lines to mass produce essentially identical chickens with desirable genetic traits. Genetics companies develop strains of grandparent and great-grandparent breeding stock

and then sell breeders to integrated Broiler producers. After an integrated producer purchases young breeder hens (aka "breeder pullets") it raises the birds to be lay eggs to be taken to incubators at an integrator-owned hatchery. The chicks from Broiler company hatcheries are then sent out to the integrator's grow-out farms to raise into adult Broilers.

191. Tyson alone among Broiler companies owns the genetics or produces the grandparent or great-grandparent strain for the Broilers it raises and slaughters. U.S. producers rely on 3 global genetics conglomerates: Cobb-Vantress (owned by Tyson), Hubbard, and Aviagen.

192. Because breeder lines are a key input into the Broiler process, Tyson's ownership and control of Cobb-Vantress provides it with exceptional leverage over other Defendants to police Defendants' illegal agreement. Tyson gives and takes away access to Cobb-Vantress' unique Broiler genetic lines, with desirable qualities like high conversion rates of feed into meat. It can also provide overzealous competitors with inferior or sick breeder pullets, even without withholding them altogether.

3. At Competitive Equilibrium, the Demand for Broilers Is Inelastic

193. In a May 2010 paper, Broiler industry consultant Michael Dicks wrote, "[b]ecause of the inelastic nature of the supply and demand [of Broilers,] a

reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price." A 2008 study conducted by the Hudson River Institute for Pilgrim's found that a one percent decrease in the supply of Broilers leads to a 0.8% increase in the price of Broilers. Such a relationship between price and supply can be very profitable for collusive industries.

194. Though consumers may sometimes choose pork or beef over Broilers, they are not economic substitutes. Studies have shown that the cross elasticity of demand between Broilers, beef, and pork is negative or statistically insignificant, indicating that pork and beef are not in fact substitutes. Even if they were substitutes, the high price of beef and pork relative to chicken makes substitution untenable.

195. Demand for Broilers has been relatively stable over the duration of the Class Period, in spite of dramatically rising prices. These prices reflect Defendants' shared strategy of coordinated reductions in supply in the face of inelastic demand.

4.    The Broiler Industry's Collusive History

196. As noted above, the Department of Justice filed a civil antitrust suit against a Broiler industry trade group in 1973, resulting in roughly $30 million in civil antitrust settlements.

197. USDA has also held a series of public workshops on competition issues in the industry. One workshop held on May 21, 2010 in Normal, Alabama

focused on Broilers. The workshops led to new proposed rules aimed at encouraging competition, but political pressure killed the proposals. A June 2014 USDA report, however, recognizes continuing competition concerns in the Broiler industry, noting that "the exercise of market power by Broiler integrators have prompted merger litigation, USDA regulatory initiatives, congressional proposals, and investigations by Federal agencies."

198.  In 2011, for instance, the Department of Justice sued to prevent the acquisition by George's of one a Tyson's plant in Harrisonburg, Virginia, which DOJ claimed would impermissibly reduce the market available to grow-out farmers for their services. DOJ eventually settled after George's promised to expand the plan in order to increase services demanded.

199.  Contract famers have often accused Broiler producers of collusive arrangements. *See, e.g.*, *Adams v. Pilgrim's Pride*, No. 2:090-cv-00397 (E.D. Tex.), *Been v. O.K. Industries*, No. 08-7078 (E.D. Okla.), and *Wheeler v. Pilgrim's Pride Corp.*, No. 5:06-cv-00004 (E.D. Tex.).

200.  Finally, there is a long tradition of collusion in meatpacking industries of all kinds. As long ago as 1919, the FTC investigated anti-competitive behavior in the industry, ultimately spurring the Packers and Stockyards Act, 7 U.S.C. §§ 193(a), 209.

5. Defendant Had Innumerable Opportunities for Face-to-Face Collusion

201. Frequent trade association meetings and investor conferences offered Defendants' senior executives constant opportunities for private, face-to-face interaction, even in the absence of many other opportunities for personal communication.

202. The National Chicken Council "represents integrated chicken producer-processors, the companies that produce, process and market chickens. [The 40] member companies of NCC account for approximately 95 percent of the chicken sold in the United States." The CEOs of the top integrated Broiler producers are routinely on the board of directors and meet at least quarterly with one another through the NCC.

203. Broiler company CEOs and top executives, including Defendants' senior executives, usually attend at least three NCC meetings each year: the January meeting held in concert with the International Poultry Expo; the mid-year Board of Directors meeting; and the Annual Meeting in October. These meetings usually include socializing among Defendants' executives, including informal private dinners, formal lunches, and recreational activities such as golf, hunting, or fishing.

204. Each Defendant is a member of the USAPEEC, the mission of which is to promote exports of U.S. poultry and eggs around the world. USAPEEC holds

Board of Directors meetings quarterly and includes executives from all or nearly all Defendants.

205. Each Defendant is also a member of U.S. Poultry, which describes itself as the world's largest and most active poultry organization. U.S. Poultry holds regular Board of Directors meetings each quarter during January, March, June, and each fall.

206. Defendants Tyson, Pilgrim's Wayne Farms, Peco, George's, O.K. Industries, Inc., and Simmons are members of the Poultry Federation, a trade organization representing Arkansas, Missouri, and Oklahoma Broiler producers. It holds regular meetings each year, including Board of Directors meetings with Defendants' senior executives.

207. As noted above, Defendants routinely attended the International Poultry Expo, later known as the International Producers and Processors Expo. This event billed itself as "the networking hub of the world for the poultry industry." The most popular panel each year is the "market intelligence" forum, which features an Agri Stats executive speaking on the Broiler industry.

208. Defendants' CEOs and senior executives also participate in numerous investor conferences organized by Wall Street analysts, providing further opportunities to meet and communicate with one another. Such conferences are held on an annual and/or ad hoc basis including, but not limited to, the Goldman

Sachs Global Staples Forum (held every May), Bank of America Merrill Lynch Global Agriculture Conference (held every February), BMO Capital Markets Annual Ag & Protein Conference (held every May), BMO Capital Markets Conference (held every May), BMO Farm to Market Conference (held every May), Urner Barry Annual Executive Conference and Marketing Seminar (held every April or May), and JP Morgan Basic Materials Conference (held every June).

209.   These meetings provide opportunities for Defendants' top executives to discuss pricing, production, and other proprietary, competitively sensitive information in a private and concealed setting. These conversations allow Defendants to reaffirm each other's' commitments to their illegal collusive arrangement.

210.   Defendants also had an opportunity to collude through Overseas Distribution solutions ("ODS"), a Webb Pomerene organization founded in 1999. A Webb Pomerene organization is an association of exporters that is exempt from certain provisions of the Sherman Antitrust Act while engaging in conduct to promote United States trade abroad. The Webb Pomerene exemption applies only to exports, however, and members are not allowed to collude in domestic markets.

211.   Tyson, Pilgrim's Sanderson, Wayne Farms, and Cagle's (now Koch Foods) were all members of ODS. The principal office for ODS was located for

much of the Class Period in the same town as Sanderson Farms' headquarters – Laurel, Mississippi. ODS operated at least through 2011.

212.   Defendants also meet each other face-to-face at plant tours and during merger and acquisition discussions, as well as miscellaneous business dealings, such as feed sales or joint ventures.

213.   For example, from April 19-21, 2013, Pilgrim's President & CEO Bill Lovette, Perdue Farms Chairman of the Board Jim Perdue, and Sanderson Farms President & COO Lampkin Butts attended a three day long "Chicken Media Summit" in North Carolina that included visits by attendees to a Sanderson Farms growhouse and processing plant.   Similarly, from April 19-21, 2015, another Chicken Media Summit was sponsored by the NCC and USAPEEC and included tours of Perdue Farms' operations and panel discussions with Defendants' senior executives.

214.   Finally, Defendants have a permissive revolving door among their respective companies. Where other industries are highly secretive and proprietary about their top executives' information, Defendants apparently allow both high and low-level employees to move amongst themselves without enforcing non-compete provisions or confidentiality agreements. For instance, Don Jackson was President of Foster Farms' Poultry Division until December 2008, but then immediately took a position as CEO of Pilgrim's.  Clint Rivers, Pilgrim's President and CEO until

68

December 2008, left the company and became Perdue Farms Senior Vice President of Operations and Supply Chain Management in 2009. Rivers then moved to Wayne Farms in 2012, where he became Chief Operating Officer.

6.      The Broiler Market Has High Barriers to Entry

215.   High barriers to entry into the Broiler market allow Defendants to sustain their collusive arrangement without attracting new entrants who seek to benefit from the cartel's supracompetitive pricing.

216.   First and foremost, because Broiler companies are so highly integrated and capital intensive, entry into the Broiler market would require enormous capital costs and a substantial ramp-up period. New entrants would need to invest untold millions on construction of processing plants, hatcheries, feed mills, and transportation and distribution infrastructure; hiring of skilled and unskilled labor, management, and contract farmers; and secure customer relationships and regulatory compliance and approval. Construction of a new integrated Broiler complex alone can cost more than $100 million, even for experienced companies.

217.   No new entrants have successfully breached the Broiler market in recent memory. One foreign company, Omtron, made a play for the U.S. market in 2011by purchasing assets from a bankrupt Broiler producer; the venture went bankrupt after only five months. Acquisitions of going concerns by foreign

conglomerates are more common, but allow existing companies to continue collusive behavior.

218. Moreover, existing companies deter new entrants by maintaining idle capacity rather than selling it. Pilgrim's, for instance, has held many of its shuttered facilities and resisted selling them. Holding facilities idle both forces new entrants to build new construction and threatens to undercut new entrants with increased production, squeezing the interloper out of the supracompetitive profits that would draw it in the first place.

### 7. Defendants Share Virtually Identical Cost Structures

219. Industries in which major players share similar organizational structures are more vulnerable to collusive agreements, because conspirators are better able to understand and negotiate each other's businesses and reach "fair" arrangements.

220. Defendants have quite similar cost structures. Broiler processing technology and process is well known and Defendants each use similar equipment and processes. Defendants each purchase breeder stock from one of three companies. And Defendants all purchase corn and soybeans on the open market, limiting their ability to obtain substantially different pricing on these key variable cost inputs for their Broilers.

70

221. Costs in the Broiler industry are largely variable. When variable costs are high relative to total costs, producers have less incentive to operate facilities at full capacity. This is conducive to artificial supply restrictions.

222. The largest component of Broiler production costs is feed, representing up to 70% of Broiler producers' total costs during the Class Period.

8. Defendants Use Agri Stats to Share an Unprecedented Level of Detail About Their Businesses in Real Time

223. Finally, Defendants all rely on an information sharing service, Agri Stats (named as a co-conspirator in this Complaint), that transmits a substantial amount of competitively sensitive and timely information to each Defendant, allowing the Defendants to police their collusive agreements with precision.

224. Agri Stats, Inc. is a private company that generates Broiler industry data "considerably more detailed than [] USDA reports," including data on weighted average price, top third average, bottom third average, and volume traded on a *daily*, weekly, and monthly basis, and supply, sales volume by detailed product type and form, export, and pricing information for whole and cut-up Broilers. According to former Pilgrim's CEO Don Jackson, Agri Stats is "basically a [] third party accounting firm that companies [use] in their process." Agri Stats claims its mission is to "[i]mprove the bottom line profitability for our participants

by providing accurate and timely comparative data while preserving confidentiality of individual companies."

225.   In contrast, the USDA and other entities publish *aggregated* weekly, monthly, and annual supply and pricing information concerning the Broiler industry. Where other information services provide only broad, anonymized data, Agri Stats provides Defendants information sufficient to determine with reasonable accuracy producer-specific production, cost, and general efficiency data.   Agri Stats also collects from and reports back to Defendants detailed statistics on almost every conceivable operating metric within the industry.

226.   Defendants participate in Agri Stats and provide and receive the detailed information described in this Complaint.  However, because many Broiler companies have kept their participation in Agri Stats completely secret, certain unnamed co-conspirators may also participate in Agri Stats.

227.   According to an expert witness for Pilgrim's, Agri Stats "is the company that gathers operating statistics from virtually every company in the chicken industry.  And they know definitively how many breeders are out there, how many pullets are out there, how many broilers are produced every week, and head count and pounds, everything else.  They have massive amounts of statistics. And that's why they're so effective at reporting all of this [production information]."

72

228.   Agri Stats's information goes into great detail. It provides complex-level data for roughly 120 U.S. Broiler complexes, identifying each with a unique number. Agri Stats provides enough information about each facility for knowledgeable insiders to make educated guesses at the identities of numbered facilities. For example, the specific type or size of a Broiler house, breed of chick, average bird size, and production levels listed in Agri Stats data for complexes allows an industry insider to identify each Defendant's individual Broiler complexes.

229.   Each Defendant and their senior executives receive numerous types of Agri Stats reports, including reports for breeding, hatching, hauling, feeding, processing, selling, and administration, which are regularly shared with managers specifically dealing with those categories of information in their daily business. Within each report, unique information referring to ostensibly "anonymous" data could permit Defendants to identify their competitors' information contained within each category of report.

230.   Information on Agri Stats's data collection is scarce, but according to a report concerning closely-analogous pork statistics, "Agri Stats collects participant financial and production data electronically each month. Internal auditors convert the data, prepare it for comparison and perform the monthly audits. Each company's financial data is reconciled to their general ledger to help

73

ensure actual costs are reported. Raw numbers are used in Agri Stats' standardized calculations so all company numbers are calculated the same way."

231.   Though Agri Stats reports are highly confidential, public information and other clues suggest that reports include sensitive information including, but not limited to, Broiler inventory levels; sales data, including finished product form and type (e.g. whole bird, cut-up, deboned), packaging form, and market segment; certain company financial metrics; slaughter and processing information, such as total volume and weight of Broilers; hatchery capacity information; and feed information.

232.   Defendants' executives comments above in earnings calls and otherwise reflect the importance of information available to each company through Agri Stats. Sanderson Farms reported in May 2008 that "every year we review our operations and every facet within Agr[i] [S]tats... we set operational goals every year . . . and [we] try to improve our operations within this benchmarking service we call Agr[i] [S]tats."  Sanderson Farms CEO Joe Sanderson commented on a December 2009 earnings call that "my judgment is that based on what I see in Agr[i] stats nobody is planning on, pullet placements say no ramp up and what I've gleaned from Agr[i] stats, people are not planning on ramping up.  I see a lot of information from Agr[i] stats that tells me that nobody is going to ramp up."  Mr. Sanderson commented in a May 2011 earnings call that "my judgment is that there

will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats." Asked later on the call by an analyst why he had said on the call and a few months earlier that he "feel[s] confident that we are going to see cutbacks" based on Agri Stats data, Sanderson indicated "industry participants expected that [the market would improve in June and July] and I think they wanted to carry their production into June and July and see if the market would reward them for that it appears right now. . . . And then once you get past July 4 . . . I think then you will start seeing reduced egg sets. . . . Typically in my experience the first cut is not enough and you go back and look at 2008, I think the industry started cutting back maybe in June and that cut back was not enough and then they made another cut in the late fall and I believe the industry became profitable in January." At a May 19, 2010 BMO Conference, Tyson compared its operating profit per live pound statistic from Agri Stats against what it said were the total of 121 plants in the Agri Stats survey.

233. As an industry-wide information exchange, Agri Stats occasionally seems to act as the industry's arbiter of production or, as it is sometimes referred to, the "benchmarking service." July 2012 trial testimony, for instance, revealed that an Agri Stats report "made statements to the effect that it thought the industry was 5 percent oversupplied relative . . . to demand." Such statements might be

taken to suggest that each Broiler producer should reduce production by 5% as a "benchmark" rate in any collusive agreement to reduce supply.

234.   Agri Stats often plays this industry forecast role, both in private at meetings with Defendants and in public fora, where Agri Stats economists provide popular market overviews. Defendant Sanderson Farms invites Agri Stats employees to present about the industry to Sanderson's own investors, such as an October 18, 2013, presentation by Agri Stats Vice President Sue Trudell. Agri Stats subsidiary EMI also holds regular invitation-only "Analytics Web Conference" calls.  Agri Stats Vice President Donohue also frequently appears at industry events, such as the Spring 2011 IPE conference.   Donohue provided comments as part of an annual "market intelligence" forum about various industry performance metrics.  Additionally, Donohue's co-panelist, Broiler industry insider Paul Aho, explicitly suggested "[t]he market is calling for around a 5% reduction in chicken production" in order for producers to achieve higher prices in 2011. Donohue also authors articles for the Agri Stats publication EMI Vital Signs.  For instance, the sole "sample" Vital Signs available on EMI's website is a May 2013 article in EMI Vital Signs by Donohue, which analyzes whether Broiler producers could continue to achieve high profit levels.  Donohue carefully analyzed Agri Stats data concerning pricing, inventory, and production levels, ultimately concluding "[w]hen supply and demand factors are in good shape the industry can

get a good return on investment and for the short and medium term it appears that there is certainly room for optimism in these factors."

235. There is no plausible, non-conspiratorial justification for the sharing of highly confidential and proprietary information among alleged competitor-Defendants about their pricing, capacity, production, and costs at the extreme level of detail available through Agri Stats. In a competitive market, such proprietary, sensitive information would be a closely guarded secret. Exchange of such information is indicative of a collusive agreement and conduces to reduced competition.

236. The FTC and DOJ produce Guidelines for Collaborations Among Competitors that make clear the risk Agri Stats poses to competition. For instance, the Guidelines note that information sharing programs in industries with a history of collusion are risky; that sharing of competitively sensitive information comes with high antitrust risk; that fresh, frequently updated information is more risky than historical information; and that collaborations among competitors with substantial market shares are of particular concern.

### G. In Addition to Coordinated Supply Restraints, Defendants Bolstered Their Agreement With Anticompetitive Tactics

#### 1. Several Defendants Control Supply and Signal Production Levels By Purchasing From Their Competitors

237. Tyson, Koch Foods, and Fieldale Farms, among other Defendants, have developed programs in which they fill customer orders with smaller Broiler producers' products. These programs allow Defendants to underproduce Broilers and soak up excess supply in the market, increasing prices. The programs also allow companies to discuss prices and negotiate on executive-to-executive levels.

238. In 2011, Tyson formalized its "Buy vs. Grow" strategy. Under the program, Tyson reduced its own supply and instead filled orders through purchases from smaller producers. By late 2014, Tyson was purchasing more than 4 million pounds of broilers from competitors each week. By late 2015 it was buying roughly 100 truckloads of chicken per week.

239. This strategy allowed Tyson to fill sales while reducing its own production and constraining the total supply of Broilers. As Fieldale Farms CEO Tom Hensly noted of its program on a November 5, 2012 call, "If you don't have a home for your chickens on Monday morning, you shouldn't have those chickens. Now we know where all our chickens are going. So we are buying chickens in that lower price area instead of selling them. So, no expansion for us."

240. This strategy does not make long term sense, because Tyson and other Defendants could produce Broilers on their own behalf more cheaply without paying smaller companies. Indeed, on an April 29, 2008 call, Tyson Executive VP and CFO Wade Miquelon described competitor purchases as a "stupid" strategy that subsidized competitors. Miquelon stated, "[W]e're going to match our supply and demand. We're not going to cut beyond that and then go out and buy open market meat to subsidize other people's growth."

241. What changed between Miquelon's statements and the institution of Buy vs. Grow is that Tyson recognized the collusive advantages of controlling overall Broiler supply by being a major purchaser of excess Broiler production. The program also enabled an uninterrupted flow of price and supply information and opportunities to communicate with competitors. Other Defendants' programs recognized similar advantages.

2.  Defendants Coordinated a Sea Change in Industry Contracting to Better Capture Price Increases

242. To better capture the fruits of their collusion, Defendants navigated industry practice away from fixed-rate long-term Broiler contracts to contracts with floating prices, enabling Defendants to capitalize on the increasing spot prices driven by their coordinated supply reductions.

243.   Fixed-rate contracts of a year or more had long been available in the industry. But these contracts would shut some Defendants out from receiving the benefits of price increases that would attend a supply reduction. Beginning in January 2008, then, several Defendants publicly announced a shift away from fixed-price contracts, just as the Defendants were also coordinating supply reductions.

244.  On January 28, 2008, Tyson CEO Dick Bond announced on an earnings call that Tyson was shortening its fixed price contracts, and by June 2009 reported it had "dramatically" shortened the amount of fixed-price contracts over 90 days.

245.   The next day, January 29, Pilgrim's CEO Rick Codgill announced that his company would also be moving away from fixed-price contracts. Though he noted legacy contracts interfered with his efforts, he was also explicit about the goal of the policy: "in a situation like where we are now where we need to drive commodity prices up, [having fewer fixed-price contracts] is going to give us the opportunity for more immediate benefit to our P&L than what we would have had say, historically three year[s] ago, when a higher percentage was fixed price." By March 2012 Pilgrim's announced that it had substantially reduced its exposure to long-term fixed contracts, and by 2014 less than 5% of its contracts were for 12 months at a fixed rate.

80

246.   On July 28, 2008, Perdue spokesperson Julie DeYoung told an industry publication that Perdue "is also seeking to raise prices and shorten its contracts." A few days later, on July 31, Joe Sanderson of Sanderson Farms noted that the industry may move toward "shorter term agreements."

247.   By the end of 2013, industry analysts had recognized the dramatic shift in industry practice. Stephens, Inc. analyst Farha Aslam noted in December 2013 that "Rather than annual fixed price contract[s] that are negotiated every fall, companies are partnering with customers and creating contracts that can be multi-year in duration.  Contracts are now being negotiated all year long and employ a wide variety of pricing methodologies." This marks the shift away from fixed-price contracts toward floating rates, even in multi-year contracts.

## CONSUMER PASS-THROUGH

248.   Defendants' conspiracy to raise, fix, or maintain the price of Broilers at artificial levels resulted in harm to Plaintiffs and Class Members because it resulted in them paying higher prices for Broilers than they would have in the absence of Defendants' conspiracy.

249.   Broilers are commodity products, with each Defendant producing functionally equivalent products.

250.   Broilers are purchased by consumers as a stand-alone product in a variety of forms and packagings (e.g., whole Broilers, parts, etc.). Consumers

81

typically purchase Broilers at retail markets (e.g., grocery stores). Retailers purchase Broilers either directly from Broiler producers or through intermediaries who may or may not add value (e.g., packaging services).

251. In this supply chain, Broilers themselves are discrete, traceable products, or components thereof, sold to consumers. Price tracing shows that changes in prices paid by direct purchasers of Broilers from Defendants affect prices paid by indirect purchasers, including Plaintiffs and Class Members.

252. While even a monopolist would increase its prices when the cost of its inputs increased, the economic necessity of passing through cost changes increases with the degree of competition a firm faces. The consumer markets for Broilers are subject to vigorous price competition. The direct purchasers of Broilers have thin net margins, and are therefore at the mercy of their input costs, such that increases in the price of Broilers for them lead to corresponding increases in prices at the consumer level. When downstream distribution markets are highly competitive, as they are in the case of Broilers, overcharges are passed through to ultimate consumers, such as the indirect-purchaser Plaintiffs and Class Members.

253. The economic and legal literature has recognized that unlawful overcharges in production normally result in higher prices for products further down the distribution chain. Two antitrust scholars — Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at

82

the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) — have observed that "in a multiple- level chain of distribution, passing on monopoly overcharges is not the exception:  it is the rule."

254.   As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Certification), an economist who presented evidence in a number of indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers.  When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers…Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets.  This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

255.   Thus, the artificially high prices Defendants charged direct purchasers for Broilers have been passed on to Plaintiffs and Class Members by direct purchasers, intermediaries and retailers. Plaintiffs and Class Members have been forced to pay supracompetitive prices for Broilers.

256.   The purpose of the conspiratorial conduct of the Defendants and their co- conspirators was to raise, fix, rig or stabilize the price of Broilers to direct purchasers and as a direct and foreseeable result, the price of Broilers paid by indirect purchasers.  The precise amount of this overcharge impacting the prices of Broilers can be measured and quantified.  Commonly used and well-accepted economic models, such as regression analyses, can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution.  Thus, the economic harm to Plaintiffs and Class Members can be quantified.

## **ANTITRUST INJURY**

257.   The effect of Defendants' conduct as described herein has been to restrain or eliminate price competition for Broilers and to artificially inflate the prices paid for Broilers by Plaintiffs and Class Members.

258.   During the Class Period, Plaintiffs and the members of the Class paid supracompetitive prices for Broilers.

259.   By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Class have sustained injury to their businesses or property, having paid higher prices for Broilers than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result have suffered damages.

260.   This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent

## AGENTS AND CO-CONSPIRATORS

261.   During the Class Period, Defendants were engaged in a common course of conduct with common goals. The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

262.   Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana. It is a subsidiary of Eli Lilly & Co., an Indiana corporation located in Indianapolis, Indiana. During the Class Period, Agri Stats acted as an agent and/or co-conspirator of the Defendants.

263.   Other persons, corporations, and business entities not named as Defendants have knowingly and willfully conspired with Defendants in the course of conduct described in this Complaint.

## THE STATUTE OF LIMITATIONS AND FRAUDULENT CONCEALMENT

264.   Plaintiffs and Class Members had no knowledge, actual or constructive, of the facts establishing their claim for relief. Plaintiffs and Class Members did not discover, and could not through the exercise of reasonable

85

diligence have discovered, the conspiracy alleged herein until shortly before filing this Complaint. Defendants conspired in secret and did not reveal facts that would put Plaintiffs or Class Members on inquiry notice that  they were conspiring to fix the price of Broilers.

265.   Throughout the Class Period Defendants and their Co-Conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and Class Members.

266.   The combination and conspiracy alleged was fraudulently concealed by Defendants by various means and methods, including secret meetings, surreptitious telephonic and in-person communications (at trade association meetings and elsewhere) between Defendants in order to prevent the existence of written records, limiting explicit references to competitor pricing or supply restraint communications on documents, and concealing the existence and nature of their conspiratorial competitor discussions from non-conspirators (including Plaintiffs, Class Members, and other customers). The conspiracy was by its nature self-concealing.

267.   As alleged above, in 2008, Broiler prices began to rise in a trend that has continued to the filing of this Complaint, in spite of the industry's prior history of boom and bust cycles and corresponding price swings. Defendants falsely attributed the price increase to pretextual reasons such as increases in the price of

inputs. These pretexts occluded the conspiracy; in fact, these price increases were the intended and actual result of Defendants' collusion, which was undisclosed at the time.

268.    During the Class Period, Defendants made numerous misleading public statements falsely portraying the market for Broilers as a competitive one. For example, Defendants provided testimony at USDA and U.S. DOJ workshops examining competition in the Broiler industry. Defendants' testimony suggested the Broiler industry was competitive and not subject to anti-competitive practices and agreements. Defendants also individually and collectively blamed increased prices on the Renewable Fuels Standard ("RFS"), arguing through trade groups (including the NCC) and through press releases, speeches, and other public statements by Defendants' employees that the RFS, rather than Defendants' illegal conspiracy, was responsible for high Broiler prices.

269.    To explain the shortage of Broilers since 2012, Defendants have provided a variety of pretextual explanations, including: (a) a breeding issue with Broilers during 2014, (b) a price spike on feed costs in 2012 (blamed on the RFS), (c) a Russian ban of U.S. Broiler imports, and (d) a 2013 Avian Flu outbreak in Mexico that caused a surge in demand for  hens to repopulate farms in Mexico. However, these explanations were pretexts behind which Defendants sought to hide their conspiratorial conduct.

270. Defendants misrepresented the importance of feed costs on their industry. For instance, Defendants repeatedly blamed Broiler prices on increases in input costs during 2008. However, while the price of corn increased from $5 per bushel in 2005-2006 to $9 per bushel by May or June 2008, by fall 2008 the price was back down to $5 per bushel.

271. Defendants were aware that their statements to the public were false: the RFS was not to blame for high prices. In a November 2012 interview, a reporter asked Fieldale Farms CEO Tom Hensley whether eliminating the Renewable Fuse Standard would not "move the needle on corn supply and prices that much" and whether there was "any danger the industry has focused too much on this as a magic bullet?" Hensley responded, "I think that's accurate. The best-case scenario is that corn would go down $1.25 per bushel and some people say it will only go down 50 cents."

272. The National Chicken Council has dutifully helped Defendants conceal their conspiracy. For instance, the NCC commissioned a May 19, 2010, report by FarmEcon LLC that concluded "it is the overall conclusion of this study that the chicken industry is a competitive and thriving sector." The NCC then issued a press release with the headline "Competition in Broiler Sector Benefits Chicken Farmers, Companies, and Consumers, Study Finds."

88

273.   NCC President Mike Brown was also a mouthpiece for Defendants to spread pretextual justifications for high Broiler prices. As noted above, Brown wrote op-eds in national newspapers offering false reasons why high prices were not stimulating higher production. These op-eds were intended to justify high Broiler prices with pretextual explanations, covering up Defendants' conspiracy.

274.   No public suit disclosed Defendants' conspiracy. *Adams v. Pilgrim's Pride*, originally filed as an adversarial bankruptcy proceeding against Pilgrim's, disclosed nothing in its Complaint or Amended Complaint that would alert Plaintiffs or Class Members to a horizontal conspiracy among Broiler producers to fix the price of Broilers.

275.   Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Plaintiffs reasonably assumed Broilers to be a competitive industry.

276.   Plaintiffs exercised reasonable diligence. Plaintiffs and Class Members could not have discovered Defendants' conspiracy earlier through exercise of reasonable diligence, because Defendants concealed their conspiracy with deceptive practices and secret conduct.

277.   By virtue of the fraudulent concealment of their wrongful conduct by Defendants and their Co-Conspirators, the statute of limitations has been tolled for any and all of Plaintiffs' and Class Members' claims.

89

## INTERSTATE TRADE AND COMMERCE

278.   Defendants' business activities that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

279.   During the Class Period, Defendants sold substantial quantities of Broilers in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States.

280.   Defendants' business activities that are the subject of this action had direct, substantial, and reasonable foreseeable effects on commerce nationwide, including in Arizona, Arkansas, California, the District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin.

## CLASS ACTION ALLEGATIONS

281.   Plaintiffs bring this action on behalf of themselves and as class claims pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the Nationwide Class and the State Classes, as those terms are defined below.

282.   The Nationwide Class consists of:

All persons and entities residing in the United States that indirectly purchased Broilers in the United States for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

283.   Plaintiffs as specifically identified herein also bring claims asserted in this action on behalf of themselves and as class claims pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to various state antitrust, unfair competition, and consumer protection laws of the states listed below on behalf of the following classes (collectively, the "State Classes").

284.   The State Classes consist of:

a. **Arizona Class**: All persons and entities residing in the United States that indirectly purchased Broilers in Arizona for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

b. **Arkansas Class**: All persons and entities residing in the United States that indirectly purchased Broilers in Arkansas for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

c. **California Class**: All persons and entities residing in the United States that indirectly purchased Broilers in California for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

d. **District of Columbia Class**: All persons and entities residing in the United States that indirectly purchased Broilers in the District of Columbia for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

e. **Florida Class**: All persons and entities residing in the United States that indirectly purchased Broilers in Florida for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

f. **Illinois Class**: All persons and entities residing in the United States that indirectly purchased Broilers in Illinois for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

g. **Iowa Class**: All persons and entities residing in the United States that indirectly purchased Broilers in Iowa for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

h. **Kansas Class**: All persons and entities residing in the United States that indirectly purchased Broilers in New York for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

i. **Maine Class**: All persons and entities residing in the United States that indirectly purchased Broilers in Maine for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

j. **Michigan Class**: All persons and entities residing in the United States that indirectly purchased Broilers in Michigan for their own consumption and not for resale from any of the Defendants

or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

k. **Minnesota Class**: All persons and entities residing in the United States that indirectly purchased Broilers in Minnesota for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

l. **Mississippi Class**: All persons and entities residing in the United States that indirectly purchased Broilers in Mississippi for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

m. **Missouri Class**: All persons and entities residing in the United States that indirectly purchased Broilers in Missouri for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

n. **Nebraska Class**: All persons and entities residing in the United States that indirectly purchased Broilers in Nebraska for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

o. **New Hampshire Class**: All persons and entities residing in the United States that indirectly purchased Broilers in New Hampshire for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

p. **New Mexico Class**: All persons and entities residing in the United States that indirectly purchased Broilers in New Mexico for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

q. **New York Class**: All persons and entities residing in the United States that indirectly purchased Broilers in New York for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

r. **North Carolina Class**: All persons and entities residing in the United States that indirectly purchased Broilers in North Carolina for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

s. **North Dakota Class**: All persons and entities residing in the United States that indirectly purchased Broilers in North Dakota for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

t. **Oregon Class**: All persons and entities residing in the United States that indirectly purchased Broilers in Oregon for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

u. **Rhode Island Class**: All persons and entities residing in the United States that indirectly purchased Broilers in Rhode Island for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

v. **South Dakota Class**: All persons and entities residing in the United States that indirectly purchased Broilers in South Dakota for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

w. **Tennessee Class**: All persons and entities residing in the United States that indirectly purchased Broilers in Tennessee for their own consumption and not for resale from any of the

Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

x. **Utah Class**: All persons and entities residing in the United States that indirectly purchased Broilers in Utah for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

y. **West Virginia Class**: All persons and entities residing in the United States that indirectly purchased Broilers in West Virginia for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

z. **Wisconsin Class**: All persons and entities residing in the United States that indirectly purchased Broilers in Wisconsin for their own consumption and not for resale from any of the Defendants or their subsidiaries or affiliates in the United States from at least as early as January 1, 2008 until the Present.

285. The Nationwide Class and the State Classes are collectively referred to herein as the "Classes" unless otherwise indicated. Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, Defendants' attorneys in this matter, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, all judges assigned to this matter, all jurors in this matter, and all persons and entities who only purchased Broilers directly or for resale.

286. Plaintiffs do not know the exact number of Class Members. However, due to the nature of the trade and commerce involved, Plaintiffs believe that there

are at least hundreds of thousands of members in each Class, such that joinder of all Class Members is impracticable.

287.   Plaintiffs are members of the National Class and State Classes. Plaintiffs' claims are typical of the claims of the Class Members because Plaintiffs purchased Broilers indirectly from one or more Defendants. As a result, Plaintiffs and all Class Members were damaged by the same wrongful conduct of Defendants and their co-conspirators as alleged herein, and the relief sought is common to the Class.

288.   There are numerous questions of law or fact common to the Classes, including but not limited to:

      a.      whether Defendants combined or conspired to fix, raise, maintain, and/or stabilize the price of Broilers in the United States;

      b.      the identity of the participants of the alleged conspiracy;

      c.      the existence and duration of the horizontal agreements alleged herein to fix, raise, maintain, and/or stabilize the prices for Broilers in the United States;

      d.      Whether the alleged conspiracy violated the Sherman Act, as alleged in Count One;

      e.      Whether the alleged conspiracy violated the state antitrust, consumer protection, and unfair competition laws alleged in Counts Two through Thirty One

      f.      whether Plaintiffs and the other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class Members; and

      g.      whether Plaintiffs and the other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief.

289.   These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class Members, including legal and factual issues relating to liability and damages.

290.   Plaintiffs will fairly and adequately represent the interests of the Class in that Plaintiffs are indirect purchasers of Broilers and have no conflict with any other members of the Classes.

291.   Plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation who have litigated innumerable class actions.

292.   Defendants' conduct was generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

97

293.   This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. There will be no material difficulty in the management of this action as a class action. Class treatment will permit adjudication of relatively small claims by Class Members who could not otherwise afford to litigate an antitrust claim such as that asserted herein. Treatment as a class action will permit a large number of similarly situated persons or entities to adjudicate their common claims in a single forum simultaneously, effectively, and without the duplication of effort and expense that numerous individual actions would engender. Further, prosecution as a class action will eliminate the possibility of repetitive litigation.

294.   The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying judgments, establishing incompatible standards of law for Defendants.

## **VIOLATIONS OF THE SHERMAN ACT**

### **COUNT ONE**

**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
(On Behalf of Nationwide Class for Injunctive and Equitable Relief)**

295.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

296.   Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2008, and continuing through the present, the exact dates being unknown to Plaintiffs, defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, stabilize, and peg prices for Broilers in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

297.   In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

A.   Fixing, raising and stabilizing the price of Broilers; and

B.   Allocating among themselves and collusively reducing the production of Broilers.

298.   The combination and conspiracy alleged herein has had the following effects, among others:

A.   Price competition in the sale of Broilers has been restrained, suppressed, and/or eliminated in the United States;

B.   Prices for Broilers sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

99

C. Those who purchased Broilers indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

299. Plaintiffs and members of the Classes have been injured and will continue to be injured in their businesses and property by paying more for Broilers purchased indirectly from the Defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy, as a result of higher prices paid for Broilers by the direct purchasers.

300. Plaintiffs and members of the Classes are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## VIOLATIONS OF STATE ANTITRUST LAWS

## COUNT TWO

**Violation of Arizona's Uniform State Antitrust Act,
Ariz. Rev. Stat. § 44-1401, et seq
(On Behalf of the Arizona Class)**

301. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

302. By reason of the conduct alleged herein, Defendants have violated Arizona Rev. Stat.§ 44-1401, *et seq.*

303.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Broilers market, a substantial part of which occurred within Arizona.

304.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Broiler market.

305.   Defendants' violations of Arizona law were flagrant.

306.   Defendants' unlawful conduct substantially affected Arizona's trade and commerce.

307.   As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and members of the Arizona Class have been injured in their business or property and are threatened with further injury.

308.   By reason of the foregoing, Plaintiffs and members of the Arizona Class are entitled to seek all forms of relief available under Arizona Revised Statute § 44-1401, *et seq.*

## COUNT THREE

**Violation of the Arkansas Unfair Practices Act,
Ark. Code Ann. § 4-75-201, et seq. and § 4-75-301, *et seq.*
(On Behalf of the Arkansas Class)**

309.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

310.   By reason of the conduct alleged herein, Defendants have violated Ark. Code Ann. § 4-75-201, *et seq.* and§ 4-75-301, *et seq.*

311.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Broilers market, a substantial part of which occurred within Arkansas.

312.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Arkansas, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Broilers market.

313.   Defendants' violations of Arkansas law were flagrant.

314.   Defendants' unlawful conduct substantially affected Arkansas' trade and commerce.

315.   Defendants' unlawful conduct caused injury, and as a result, Plaintiffs and the members of the Arkansas Class have been damaged in their business or property and are threatened with further damages.

102

316.  By reason of the foregoing, Plaintiffs and members of the Arkansas Class are entitled to seek all forms of relief, including treble damages, reasonable attorney's fees and costs, and injunctive relief available under Ark. Code Ann. § 4-75-211.

## COUNT FOUR

**Violation of California's Cartwright Act,
Cal. Bus. & Prof. Code § 16700, *et seq,*
(On Behalf of the California Class)**

317.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

318.  The California Business & Professions Code generally governs conduct of corporate entities.  The Cartwright Act, Cal. Bus. & Prof. Code §§16700-16770, governs antitrust violations in California.

319.  California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

320.  Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

321. A trust in California is any combination intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of merchandise, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. *Id.* at § 16726.

322. Plaintiffs purchased Broilers within the State of California during the Class Period. But for Defendants' conduct set forth herein, the price of Broilers would have been lower, in an amount to be determined at trial.

323. Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, *et seq.*

324. Plaintiffs and members of the California Class were injured in their business or property, with respect to purchases of Broilers in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

## COUNT FIVE

### Violation of the District of Columbia Antitrust Act,
### D.C. Code § 28-4501, *et seq.*
### (On Behalf of the District of Columbia Class)

325.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

326.  The policy of District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices."

327.  Plaintiffs purchased Broilers within the District of Columbia during the Class Period.  But for Defendants' conduct set forth herein, the price of Broilers would have been lower, in an amount to be determined at trial.

328.  Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint, because "any indirect purchaser in the chain of manufacture, production or distribution of goods shall be deemed to be injured within the meaning of this chapter."  D.C. Code § 28-4509(a).

329.  Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, and monopolized or attempted to

monopolize the market for Broilers within the District of Columbia, in violation of D.C. Code§ 28-4501, *et seq.*

330.    Plaintiffs and members of the District of Columbia Class were injured with respect to purchases of Broilers in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, and interest, reasonable attorneys' fees and costs.

## COUNT SIX

### Violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/3(1), et seq. (On Behalf of the Illinois Class)

331.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

332.    The Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*, aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade . . . ." 740 ILCS 10/7(2).

333.    Plaintiffs purchased Broilers within the State of Illinois during the Class Period. But for Defendants' conduct set forth herein, the price of Broilers would have been lower, in an amount to be determined at trial.

334.    Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 ILCS 10/7(2).

335.    Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their prior agreement, for the purpose of fixing, controlling or maintaining  prices for Broilers sold, and/or  for allocating  customers or markets for Broilers within the intrastate commerce of Illinois.

336.    Defendants further unreasonably restrained trade or commerce and established, maintained or attempted to acquire monopoly power over the market for Broilers in Illinois for the purpose of excluding competition, in violation of 740 ILCS 10/1, *et seq.*

337.    Plaintiffs and members of the Illinois Class were injured with respect to purchases of Broilers in Illinois and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs.

## COUNT SEVEN

**Violation of the Iowa Competition Law**
**Iowa Code§ 553.1, et seq.**
**(On Behalf of the Iowa Class)**

338.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

107

339.   The Iowa Competition Law aims to "prohibit[] restraint of economic activity and monopolistic practices."  Iowa Code§ 553.2.

340.   Plaintiffs purchased Broilers within the State of Iowa during the Class Period. But for Defendants' conduct set forth herein, the price of Broilers would have been lower, in an amount to be determined at trial.

341.   Defendants contracted, combined or conspired to restrain or monopolize trade in the market for Broilers, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for Broilers, in violation of Iowa Code§ 553.1, *et seq.*

342.   Plaintiffs and members of the Iowa Class were injured with respect to purchases of Broilers in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

## COUNT EIGHT

### Violation of the Kansas Restraint of Trade Act
### Kan. Stat. Ann. § 50-101, et seq.
### (On Behalf of the Kansas Class)

343.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

344.   The Kansas Restraint of Trade Act aims to prohibit practices which, inter alia, "tend to prevent full and free competition in the importation,

108

transportation or sale of articles imported into this state." Kan. Stat. Ann. § 50-112.

345. Plaintiffs purchased Broilers within the State of Kansas during the Class Period. But for Defendants' conduct set forth herein, the price of Broilers would have been lower, in an amount to be determined at trial.

346. Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Kan. Stat. Ann§ 50-161(b).

347. Defendants combined capital, skill or acts for the purposes of creating restrictions in trade or commerce of Broilers, increasing the price of Broilers, preventing competition in the sale of Broilers, or binding themselves not to sell Broilers, in a manner that established the price of Broilers and precluded free and unrestricted competition among themselves in the sale of Broilers, in violation of Kan. Stat. Ann. § 50-101, et seq.

348. Plaintiffs and members of the Kansas Class were injured with respect to purchases of Broilers in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

## COUNT NINE

### Violation of the Maine's Antitrust Statute
### Me. Rev. Stat. Ann. Tit. 10 § 1101, et seq.
### (On Behalf of the Maine Class)

349. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

350. Part 3 of Title 10 the Maine Revised Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally prohibiting contracts in restraint of trade and conspiracies to monopolize trade. Me. Rev. Stat. Ann. Tit. 10, §§ 1101-02.

351. Plaintiffs purchased Broilers within the State of Maine during the Class Period. But for Defendants' conduct set forth herein, the price of Broilers would have been lower, in an amount to be determined at trial.

352. Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

353. Defendants contracted, combined or conspired in restraint of trade or commerce of Broilers within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of Broilers within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, § 1101, et seq.

110

354.   Plaintiffs and members of the Maine Class were injured with respect to purchases of Broilers in Maine and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' and experts' fees and costs.

## COUNT TEN

### Violation of the Michigan Antitrust Reform Act
### Mich. Comp. Laws § 445.771, et seq.
### (On Behalf of the Michigan Class)

355.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

356.   The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce...to prohibit monopolies and attempts to monopolize trade or commerce. . . [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984.

357.   Plaintiffs purchased Broilers within the State of Michigan during the Class Period. But for Defendants' conduct set forth herein, the price of Broiler would have been lower, in an amount to be determined at trial.

358.   Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws. § 452.778(2).

359. Defendants contracted, combined or conspired to restrain or monopolize trade or commerce in the market for Broilers, in violation of Mich. Comp. Laws § 445.772, *et seq.*

360. Plaintiffs and members of the Michigan Class were injured with respect to purchases of Broilers in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

## COUNT ELEVEN

### Violation of the Minnesota Antitrust Law,
### Minn. Stat. § 325D.49, et seq.
### (On Behalf of the Minnesota Class)

361. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

362. The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in Minnesota; any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of these affect Minnesota trade or commerce.

363. Plaintiffs purchased Broilers within the State of Minnesota during the Class Period. But for Defendants' conduct set forth herein, the price of Broilers would have been lower, in an amount to be determined at trial.

364. Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.56.

365. Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the market for Broilers within the intrastate commerce of and outside of Minnesota, established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the market for Broilers within the intrastate commerce of and outside of Minnesota; and fixed prices and allocated markets for Broilers within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, *et seq.*

366. Plaintiffs and members of the Minnesota Class were injured with respect to purchases of Broilers in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

## COUNT TWELVE

### Violation of the Mississippi Antitrust Statute, Miss. Code Ann. § 75-21-1, et seq. (On Behalf of the Mississippi Class)

367. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

368. Title 75 of the Mississippi Code regulates trade, commerce and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. Miss. Code Ann. § 75-21-39.

369. Trusts are combinations, contracts, understandings or agreements, express or implied, when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. Miss. Code Ann. §75-21-1.

370. Plaintiffs purchased Broilers within the State of Mississippi during the Class Period. But for Defendants' conduct set forth herein, the price of Broilers would have been lower, in an amount to be determined at trial.

371. Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann.§ 75-21-9.

114

372.   Defendants combined, contracted, understood and agreed in the market for Broilers, in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of Broilers and hindering competition in the sale of Broilers, in violation of Miss. Code Ann.§ 75-21-l(a), *et seq.*

373.   Defendants monopolized or attempted to monopolize the production, control or sale of Broilers, in violation of Miss. Code Ann. § 75-21-3, *et seq.*

374.   Defendants' Broilers are sold indirectly via distributors throughout the State of Mississippi.   During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

375.   Plaintiffs and members of the Mississippi Class were injured with respect to purchases of Broilers in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

## COUNT THIRTEEN

**Violation of the Missouri Merchandising Practices Act,**
**Mo. Ann. Stat. § 407.010, et seq.**
**(On Behalf of the Missouri Class)**

376.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

377.   Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

115

378.   Plaintiffs purchased Broilers within the State of Missouri during the Class Period. But for Defendants' conduct set forth herein, the price of Broilers would have been lower, in an amount to be determined at trial.

379.   Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007).

380.   Defendants contracted, combined or conspired in restraint of trade or commerce of Broilers within the intrastate commerce of Missouri, and monopolized or attempted to monopolize the market for Broilers within the intrastate commerce of Missouri by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Mo. Ann. Stat. § 407.010, *et seq.*

381.   Plaintiffs and members of the Missouri Class were injured with respect to purchases of Broilers in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

## COUNT FOURTEEN

**Violation of the Nebraska Junkin Act,
Neb. Rev. Stat. § 59-801, et seq.
(On Behalf of the Nebraska Class)**

382.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

383.  Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices.  Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

384.  Plaintiffs purchased Broilers within the State of Nebraska during the Class Period. But for Defendants' conduct set forth herein, the price of Broilers would have been lower, in an amount to be determined at trial.

385.  Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint.  Neb. Rev. Stat. § 59-821.

386.  Defendants contracted, combined or conspired in restraint of trade or commerce of Broilers within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the market for Broilers within the intrastate commerce of Nebraska by possessing monopoly power in the market and

117

willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, *et seq.*

387.   Plaintiffs and members of the Nebraska Class were injured with respect to purchases of Broilers in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

## COUNT FIFTEEN

### Violation of New Hampshire's Antitrust Statute, N.H. Rev. Stat. Ann. Title XXXI, § 356, et seq. (On Behalf of the New Hampshire Class)

388.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

389.   Title XXXI of the New Hampshire Statutes generally governs trade and commerce. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade.  N.H. Rev. Stat. Ann. §§ 356:2, 3.

390.   Plaintiffs purchased Broilers within the State of New Hampshire during the Class Period.  But for Defendants' conduct set forth herein, the price of Broilers would have been lower, in an amount to be determined at trial.

391. Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

392. Defendants fixed, controlled or maintained prices for Broilers, allocated customers or markets for Broilers, and established, maintained or used monopoly power, or attempted to, constituting a contract, combination or conspiracy in restraint of trade in violation of N.H. Rev. Stat. Ann.§ 356:1, et seq.

393. Plaintiffs and members of the New Hampshire Class were injured with respect to purchases of Broilers in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

## COUNT SIXTEEN

**Violation of the New Mexico Antitrust Act,
N.M. Stat. Ann.§§ 57-1-1, et seq.
(On Behalf of the New Mexico Class)**

394. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

395. The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices. N.M. Stat. Ann. 57-1-15.

396.    Plaintiffs purchased Broilers within the State of New Mexico during the Class Period.   But for Defendants' conduct set forth herein, the price of Broilers would have been lower, in an amount to be determined at trial.

397.    Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  N.M. Stat. Ann.§ 57-1-3.

398.    Defendants contracted, agreed, combined or conspired, and monopolized or attempted to monopolize trade for Broilers within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann.§ 57-1-1, *et seq.*

399.    Plaintiffs and members of the New Mexico Class were injured with respect to purchases of Broilers in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

## COUNT SEVENTEEN

### Violation of Section 340 of the New York General Business Law
### (On Behalf of the New York Class)

400.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

401.    Article 22 of the New York General Business Law general prohibits monopolies and contracts or agreements in restraint of trade, with the policy of

120

encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law§ 340(1).

402.   Plaintiffs purchased Broilers within the State of New York during the Class Period.  But for Defendants' conduct set forth herein, the price of Broilers would have been lower, in an amount to be determined at trial.

403.   Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  N.Y. Gen. Bus. Law§ 340(6).

404.   Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of Broilers and restrained competition in the free exercise of the conduct of the business of Broilers within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law§  340, *et seq.*

405.   Plaintiffs and members of the New York Class were injured with respect to purchases of Broilers in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees.

## COUNT EIGHTEEN

### Violation of the North Carolina General Statutes,
### N.C. Gen. Stat. § 75-1, et seq.
### (On Behalf of the North Carolina Class)

406.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

407.    Defendants entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the Broiler Market, a substantial part of which occurred within North Carolina.

408.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Broiler Market, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within North Carolina.

409.    Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

410.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the North Carolina Class have been injured in their business or property and are threatened with further injury.

411.    By reason of the foregoing, Plaintiffs and members of the North Carolina Class are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-1, *et seq.*

122

## COUNT NINETEEN

### Violation of the North Dakota Uniform State Antitrust Act, N.D. Cent. Code § 51-08.1, et seq. (On Behalf of the North Dakota Class)

412. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

413. The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. N.D. Cent. Code§ 51-08.1, *et seq.*

414. Plaintiffs purchased Broilers within the State of North Dakota during the Class Period. But for Defendants' conduct set forth herein, the price of Broilers would have been lower, in an amount to be determined at trial.

415. Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. Cent. Code §51-08.1-08.

416. Defendants contracted, combined or conspired in restraint of, or to monopolize trade or commerce in the market for Broilers, and established, maintained, or used a monopoly, or attempted to do so, for the purposes of excluding competition or controlling, fixing or maintaining prices for Broilers, in violation of N.D. Cent. Code §§ 51-08.1-02, 03.

417. Plaintiffs and members of the North Dakota Class were injured with respect to purchases in North Dakota and are entitled to all forms of relief,

including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief.

## COUNT TWENTY

**Violation of the Oregon Antitrust Law,
Or. Rev. Stat. § 646.705, et seq.
(On Behalf of the Oregon Class)**

418.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

419.  Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon.  Sections 705 through 899 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state."  Or. Rev. Stat. § 646.715.

420.  Plaintiffs purchased Broilers within the State of Oregon during the Class Period. But for Defendants' conduct set forth herein, the price of Broilers would have been lower, in an amount to be determined at trial.

421.  Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. § 646.780(1)(a).

124

422.   Defendants contracted, combined, or conspired in restraint of trade or commerce of Broilers, and monopolized or attempted to monopolize the trade or commerce of Broilers, in violation of Or. Rev. Stat. § 646.705, *et seq.*

423.   Plaintiffs and members of the Oregon Class were injured with respect to purchases of Broilers within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

## COUNT TWENTY-ONE

**Violation of the Rhode Island Antitrust Act,**
**R.I. Gen Laws § 6-36-1, et seq.**
**(On Behalf of the Rhode Island Class)**

424.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

425.   The Rhode Island Antitrust Act aims to promote the unhampered growth of commerce and industry throughout Rhode Island by prohibiting unreasonable restraints of trade and monopolistic practices that hamper, prevent or decrease competition.  R.I. Gen. Laws § 6-36-2(a)(2).

125

426.   Plaintiffs purchased Broilers within the State of Rhode Island during the Class Period.   But for Defendants' conduct set forth herein, the price of Broilers would have been lower, in an amount to be determined at trial.

427.   Under the Rhode Island Antitrust Act, as of January 1, 2008, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.   R.I. Gen. Laws § 6-36-11(a).   In Rhode Island, the claims of the Plaintiffs and the Class alleged herein run from January 1, 2008, through the date that the effects of Defendants' anticompetitive conduct cease.

428.   Defendants contracted, combined and conspired in restraint of trade of Broilers within the intrastate commerce of Rhode Island, and established, maintained or used, or attempted to establish, maintain or use, a monopoly in the trade of Broilers for the purpose of excluding competition or controlling, fixing or maintaining prices within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws § 6-36-1, et seq.

429.   Plaintiffs and members of the Rhode Island Class were injured with respect to purchases of Broilers in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

## COUNT TWENTY-TWO

### Violation of the South Dakota Antitrust Statute,
### S.D. Codified Laws§ 37-1-3.1, et seq.
### (On Behalf of the South Dakota Class)

430.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

431.   Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies and discriminatory trade practices.  S.D. Codified Laws§§ 37-1-3.1, 3.2.

432.   Plaintiffs purchased Broilers within the State of South Dakota during the Class Period.  But for Defendants' conduct set forth herein, the price of Broilers would have been lower, in an amount to be determined at trial.

433.   Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint.  S.D. Codified Laws § 37-1-33.

434.   Defendants contracted, combined or conspired in restraint of trade or commerce of Broilers within the intrastate commerce of South Dakota, and monopolized or attempted to monopolize trade or commerce of Broilers within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws§  37-1, et seq.

435.   Plaintiffs and members of the South Dakota Class were injured with respect to purchases of Broilers in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

## COUNT TWENTY-THREE

### Violation of Tennessee Code §§ 47-25-101, et seq.
### (On Behalf of the Tennessee Class)

436.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

437.   The Tennessee Code declares that "agreements … made with a view to lessen, or which tend to less, full and free competition in the importation or sale of articles imported into" the state to be unlawful. Tennessee Code §§ 47-25-101.

438.   Defendants' combination or conspiracy had the following effects: (1) price competition for Broilers was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for Broilers were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and the Tennessee Class were deprived of free and open competition; and (4) Plaintiffs and the Tennessee Class paid supra-competitive, artificially inflated prices for Broilers.

439.   During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce as Broilers were sold in Tennessee.

128

440. As a direct and proximate result of Defendants' unlawful conduct, the Tennessee Class has been injured in their business and property and are threatened with further injury.

441. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code §§ 47-25-101, *et seq.* Accordingly, Plaintiffs and the Tennessee Class seek all relief available under Tennessee Code §§ 47-25-101, et seq.

## COUNT TWENTY-FOUR

**Violation of the Utah Antitrust Act,
Utah Code Ann. §§ 76-10-911, et seq.
(On Behalf of the Utah Class)**

442. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

443. The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce …" Utah Code Ann.§ 76-10-3102.

444. Plaintiffs purchased Broilers within the State of Utah during the Class Period. But for Defendants' conduct set forth herein, the price of Broilers would have been lower, in an amount to be determined at trial.

129

445.   Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

446.   Defendants contracted, combined or conspired in restraint of trade or commerce of Broilers, and monopolized  or attempted  to monopolize  trade or commerce  of Broilers, in violation of Utah Code Ann.§ 76-10-3101, *et seq.*

447.   Plaintiffs and members of the Utah Class who are either Utah residents or Utah citizens were injured with respect to purchases of Broilers in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

## COUNT TWENTY-FIVE

**Violation of the West Virginia Antitrust Act,**
**W.Va. Code § 47-18-1, et seq.**
**(On Behalf of the West Virginia Class)**

448.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

449.   The violations of federal antitrust law set forth above also constitute violations of section 47-18-1 of the West Virginia Code.

450.   During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy in unreasonable

130

restraint of trade and commerce and other anticompetitive conduct alleged above in violation of W.Va. Code§ 47-18-1, *et seq.*

451.   Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

452.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the West Virginia Class have been injured in their business and property in that they paid more for Broilers than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, Plaintiffs and members of the West Virginia Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to Section 47-18-9 of the West Virginia Code.

## COUNT TWENTY-SIX

### Violation of the Wisconsin Antitrust Act, Wis. Stat. Ann. § 133.01(1), et seq. (On Behalf of the Wisconsin Class)

453.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

454.   Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of

131

monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. § 133.01.

455. Plaintiffs purchased Broilers within the State of Wisconsin during the Class Period. But for Defendants' conduct set forth herein, the price of Broilers would have been lower, in an amount to be determined at trial.

456. Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. Wis. Stat. 133.18(a).

457. Defendants contracted, combined or conspired in restraint of trade or commerce of Broilers, and monopolized or attempted to monopolize the trade or commerce of Broilers, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. § 133.01, et seq.

458. Plaintiffs and members of the Wisconsin Class were injured with respect to purchases of Broilers in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices for Defendants' Broilers in Wisconsin.

459.   Accordingly, Plaintiffs and members of the Wisconsin Class are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

460.   Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States.  Their injuries consist of: (1) being denied the opportunity to purchase lower-priced Broilers from Defendants, and (2) paying higher prices for Defendants' Broilers than they would have in the absence of Defendants' conduct.  These injuries are of the type of the laws of the above States were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

461.   Defendants are jointly and severally liable for all damages suffered by Plaintiffs and members of the Classes.

## VIOLATION OF STATE CONSUMER PROTECTION AND UNFAIR COMPETITION LAWS

### COUNT TWENTY-SEVEN

**Violation of California's Unfair Competition Law
Cal. Bus. & Prof. Code § 17200, et seq. (the "UCL")
(On Behalf of the California Class)**

462.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

133

463. By reason of the foregoing, Defendants have violated California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*

464. Defendants committed acts of unfair competition, as defined by section 17200, *et seq.*, by engaging in a conspiracy to fix and stabilize the price of Broilers as described above.

465. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, constitute a common and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act; (2) violation of the Cartwright Act.

466. Defendants' acts, omissions, misrepresentations, practices and nondisclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

467. Defendants' acts or practices are fraudulent or deceptive within the meaning of section 17200, *et seq.*

468. Defendants' conduct was carried out, effectuated, and perfected within the State of California. Defendants maintained offices in California where

their employees engaged in communications, meetings and other activities in furtherance of Defendants' conspiracy.

469. By reason of the foregoing, the Plaintiffs and the California Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

## COUNT TWENTY-EIGHT

**Violation of the Florida Deceptive and Unfair Trade Practices Act,
Fla. Stat. § 501.201(2), et seq.
(On Behalf of the Florida Class)**

470. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

471. By reason of the foregoing, Defendants have violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

472. Defendants' unlawful conduct had the following effects: (1) price competition for Broilers was restrained, suppressed, and eliminated throughout Florida; (2) prices for Broilers were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and the Florida Class were deprived of free and open competition; and (4) Plaintiffs and the Florida Class paid supra-competitive, artificially inflated prices for Broilers.

135

473. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

474. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Florida Class have been injured and are threatened with further injury.

475. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §§ 501.201, *et seq.*, and, accordingly, Plaintiffs and the Florida Class seek all relief available under that statute.

## COUNT TWENTY-NINE

### Violation of Missouri's Merchandising Practices Act, Mo. Rev. Stat. § 407.020 (On Behalf of the Missouri Class)

476. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

477. By reason of the foregoing, Defendants have violated Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020. Plaintiffs on behalf of the Missouri Class alleges as follows:

478. Plaintiffs and members of the Missouri Class purchased Broilers for personal, family, or household purposes.

136

479.   Defendants engaged in the conduct described herein in connection with the sale of Broilers in trade or commerce in a market that includes Missouri.

480.   Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Broilers were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and the members of the Missouri Class.

481.   Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and the members of the Missouri Class concerning Defendants' unlawful activities and artificially inflated prices for Broilers.  The concealed, suppressed, and omitted facts would have been important to Plaintiffs and the members of the Missouri Class as they related to the cost of Broilers that they purchased.

482.   Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Broilers by making public statements that were not in accord with the facts.

483.   Defendants' statements and conduct concerning the price of Broilers were deceptive as they had the tendency or capacity to mislead Plaintiffs and the members of the Missouri Class to believe that they were purchasing Broilers at

prices established by a free and fair market. Defendants' unlawful conduct had the following effects: (1) Broiler price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Broiler prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Missouri Class were deprived of free and open competition; and (4) Plaintiffs and members of the Missouri Class paid supra-competitive, artificially inflated prices for Broilers.

484. The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

485. As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Missouri Class suffered ascertainable loss of money or property.

486. Accordingly, Plaintiffs and members of the Missouri Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce," as further interpreted by the Missouri Code of State Regulations, 15

CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

## COUNT THIRTY

### Violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1602, et seq. (On Behalf of the Nebraska Class)

487. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

488. By reason of the foregoing, Defendants have violated Nebraska's Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq.* Plaintiffs on behalf of the Nebraska Damages Class alleges as follows:

489. Defendants' unlawful conduct had the following effects: (1) Broiler price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Broiler prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and the Nebraska Class were deprived of free and open competition; and (4) Plaintiffs and the Nebraska Class paid supra-competitive, artificially inflated prices for Broilers.

490. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

491.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Nebraska Class have been injured and are threatened with further injury.

492.   Defendants' actions and conspiracy have had a substantial impact on the public interests of Nebraska and its residents.

493.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nebraska's Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq.* and, accordingly, Plaintiffs and the Nebraska Class seek all relief available under that statute.

## COUNT THIRTY-ONE

### Violation of Section 349 of the New York General Business Law
### (On Behalf of the New York Class)

494.   By reason of the foregoing, Defendants have violated New York's General Business Law, N.Y. Gen. Bus. Law § 349, *et seq.*  Plaintiffs on behalf of the New York Class alleges as follows:

495.   Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and noncompetitive levels, the prices at which Broilers were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and the New York Class.

140

496. The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

497. Defendants made certain statements about Broilers that they knew would be seen by New York residents and these statements either omitted material information that rendered the statements they made materially misleading or affirmatively misrepresented the real cause of price increases for Broilers.

498. Defendants' unlawful conduct had the following effects: (1) Broiler price competition was restrained, suppressed, and eliminated throughout New York; (2) Broiler prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and the New York Class were deprived of free and open competition; and (4) Plaintiffs and the New York Class paid supra-competitive, artificially inflated prices for Broilers.

499. During the Class Period, Defendants' illegal conduct substantially affected New York commerce and consumers.

500. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Broilers in New York.

501.    Plaintiffs and the New York Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.    Without prejudice to their contention that Defendants' unlawful conduct was willful and knowing, Plaintiffs and the New York Damages Class do not seek in this action to have those damages trebled pursuant to N.Y. Gen. Bus. Law § 349(h).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class herein, adjudging and decreeing that:

a.    This action may be certified and maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.    Plaintiffs be designated as the Class representative and their counsel as Class Counsel;

c.    Defendants' conduct constituted an unlawful restraint of trade in violation of the federal and state statutes alleged herein, and that Defendants are liable for the conduct or damage inflicted by any other co-conspirator;

d.    Plaintiffs and Class Members be awarded actual damages sustained by them, statutory damages, punitive or treble damages, and/or restitution or such other relief (at law or in equity) as may be provided by the

142

federal and state antitrust laws, and that judgment in favor of Plaintiffs and the Class be entered against Defendants, jointly and severally, in an amount to be determined in accordance with such laws;

e.   Defendants and their co-conspirators, including each Defendants' respective subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and restrained from continuing and maintaining the conspiracy or agreement alleged herein;

f.   Plaintiffs and Class Members be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

g.   Plaintiffs and Class Members shall recover reasonable attorneys' fees and costs of this suit as provided by law; and

h.   Plaintiffs and Class Members shall receive such other or further relief as may be just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs request a jury trial on all matters so triable.

Dated: September 16, 2016    Respectfully submitted,


*/s/ Carol V. Gilden*

Carol V. Gilden (IL #6185530)
Daniel H. Silverman
**COHEN MILSTEIN SELLERS & TOLL, PLLC**
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
Fax: (312) 357-0369
cgilden@cohenmilstein.com
dsilverman@cohenmilstein.com

Kit A. Pierson
Richard A. Koffman
Emmy L. Levens
Robert W. Cobbs
**COHEN MILSTEIN SELLERS & TOLL, PLLC**
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
Fax: (202) 408-4699
kpierson@cohenmilstein.com
rkoffman@cohenmilstein.com
elevens@cohenmilstein.com
rcobbs@cohenmilstein.com

*Attorneys for Plaintiffs Christopher Gilbert, Alison Pauk, Marilyn Strangeland, Leslie Weidner, and David Weidner*

144